## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Greenpeace, Inc.,
702 H Street N.W.
Washington, D.C. 20001

           Plaintiff,

   v.

The Dow Chemical Company
c/o The Corporation Trust Company
Corporation Trust Center 1209 Orange Street
Wilmington, DE 19801,

Sasol North America, Inc.,
c/o The Corporation Trust Company
Corporation Trust Center 1209 Orange Street
Wilmington, DE 19801,

Dezenhall Resources, Ltd.,
c/o The Corporation Trust Company
Corporation Trust Center 1209 Orange Street
Wilmington, DE 19801,

Ketchum, Inc.
c/o The Prentice-Hall Corporation System, Inc.
2711 Centerville Road, Suite 400
Wilmington, DE 19808,

Timothy Ward
28860 Almshouse Road
Oxford, MD 21654,

Jay Arthur Bly
8231 Hortonia Point Drive
Millersville, MD 21108,

Michael Mika
25423 Planting Field Drive #D
Chantilly, VA 20152,

George Ferris
511 Old Pasture Lane
Severna Park, Maryland 21146, and Does 1-20,

           Defendants.

Civil Action No. _____
Jury Trial Demanded


**COMPLAINT**

## INTRODUCTION

This case is brought by Plaintiff Greenpeace, Inc. ("Greenpeace") against two major chemical companies, their public relations companies, and various individuals who engaged in a pattern and practice of clandestine and unlawful activities that has included misappropriation and theft of confidential information and trade secrets, unlawful surveillance, misuse of law enforcement personnel, and, in all likelihood, unlawful breaking and entering into Greenpeace offices and other locations. This unlawful scheme was an effort to secure confidential information about, and potentially disrupt, the efforts of Greenpeace and other non-profit organizations and individuals to expose and inform the public and regulators about the chemical companies' activities that were damaging to the environment. Because of the clandestine nature of Defendants' scheme, and actions that were taken to shred and/or "sterilize" records maintained by conspirators, Greenpeace has no way to ascertain the full scope and duration of these activities. The unlawful activities it has learned of, as described below, demonstrate both a pattern and practice of actions by the Defendants to intrude upon and invade the privacy and lawful interests of Greenpeace and misappropriate its confidential information for economic gain. This action has been brought to secure all appropriate relief, including any relief necessary to ensure that none of the Defendants continues to engage in any of these unlawful actions. In support of the Complaint, Plaintiff alleges as follows:

1.      Plaintiff Greenpeace brings this Complaint against Defendants The Dow Chemical Company ("Dow"), Sasol North America, Inc. ("Sasol"), Ketchum Inc. ("Ketchum"), Dezenhall Resources, Ltd. ("Dezenhall"), Timothy Ward, Jay Arthur Bly, Michael Mika, and George Ferris, for compensatory, statutory and punitive damages.

2.      Plaintiffs allege that between 1998 and 2000, Defendants conspired to and did surveil, infiltrate and steal confidential information from Greenpeace with the intention of preempting, blunting or thwarting its environmental campaigns.  These unlawful activities included trespassing on the property of Greenpeace, infiltrating its offices, meetings and electronic communications under false pretenses and/or by force, and by these means, stealing confidential documents, data and trade secrets from Greenpeace.  As described below, the defendant chemical companies paid other members of the conspiracy, including a private security firm (Beckett Brown International) that employed the individual defendants, for confidential information unlawfully obtained from Greenpeace.  Dow, Sasol, Ketchum and Dezenhall used the confidential information obtained from Greenpeace to anticipate and frustrate Greenpeace's public education and direct-action campaigns, fundraising plans and otherwise undermine Greenpeace's business.

## JURISDICTION AND VENUE

3.      This action arises under The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

4.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.  This Court has personal jurisdiction over Defendants because Defendants transact business on a systematic and continuous basis within the District of Columbia and/or engaged in the misconduct alleged herein in the District of Columbia.

5.      This Court has supplemental jurisdiction of the pendant state-law claims under 28 U.S.C. § 1367.

6.      Venue for this action is proper in the District of Columbia pursuant to 28 U.S.C. §1391(a) because a substantial part of the events giving rise to Plaintiff's claims occurred in this

- 3 -

judicial district and Defendants are subject to the personal jurisdiction of this judicial district.

## PLAINTIFF

7.      Plaintiff Greenpeace, Inc. is a nonprofit California corporation headquartered in Washington, D.C.  Founded in 1971, Greenpeace is one of the oldest and largest environmental organizations in the world, and it campaigns to protect the oceans and ancient forests and to end toxic pollution, global warming, nuclear hazards and genetic engineering.

## DEFENDANTS

8.      Defendant The Dow Chemical Company is a publicly-traded, for-profit Delaware corporation with its principal place of business in Midland, Michigan.  Dow Chemical sells chemical, plastic and agricultural products and services.

9.      Defendant Sasol North America, Inc. is a for-profit producer of commodity and specialty chemicals incorporated in Delaware and headquartered in Houston, Texas.  The company was founded in 1984 under the name CONDEA Vista Company.  In 1991, it became a wholly-owned subsidiary of RWE-DEA AG, a German oil and gas producer.  On March 1, 2001, Sasol Ltd. concluded an agreement with RWE-DEA AG to purchase the CONDEA Vista Company, and CONDEA Vista Company changed its name to Sasol North America, Inc.  Sasol North America, Inc. is a subsidiary of Sasol, Ltd.  During the relevant time period, Sasol North America (then, CONDEA Vista) made ethylene dichloride and vinyl chloride at a manufacturing facility in Lake Charles, Louisiana.

10.     Defendant Ketchum Inc. is a for-profit public relations firm incorporated in Delaware and headquartered in New York with offices in Washington, D.C.  Ketchum is one of the oldest and largest public relations firms in the United States and operates in more than 50 countries.  Since 1996, Ketchum has been a subsidiary of Omnicom Group Inc., a publicly traded

advertising and marketing firm.

11.     Defendant Dezenhall Resources, Ltd. is a for-profit public relations firm incorporated in Delaware and headquartered in Washington, D.C.  Formerly known as Nichols-Dezenhall, the firm was founded in 1987 by David Nichols and Eric Dezenhall and changed its name to Dezenhall Resources, Ltd. when Nichols left the firm in 2004.

12.     Defendant Timothy Ward is a resident of Maryland.  He was hired by Beckett Brown International, Inc. ("BBI") in June 1996 as the Director of Investigative Services.  In March 1998, he was promoted to Vice President for Investigations; in August 1998, he additionally became Vice President for Business Information Services.  In August 1999, Ward also became a member of the Board of Directors.  In December 1999, he was promoted to President and Managing Director and served in those positions until his departure from the company on January 26, 2001.

13.     Defendant Jay Arthur Bly is a resident of Maryland.  He served as a Manager of Special Projects at BBI.  As an employee of BBI, Bly reported directly to Timothy Ward.

14.     Defendant Michael Mika is a resident of Virginia.  Between 1998 and 2000, he served as a Manager of Special Projects at BBI.  As an employee of BBI, Mika reported to Timothy Ward.

15.     Defendant George Ferris is a resident of Maryland.  Ferris served as a Manager of Investigative Support for BBI.  As an employee of BBI, Ferris reported to Timothy Ward.

16.     Defendants John Doe 1-20 are other individuals, businesses and/or trade associations that participated in and facilitated the unlawful conspiracy and related activities described herein.

## FACTUAL ALLEGATIONS

### Greenpeace's Environmental Campaigns

17. Greenpeace uses communication, public education and peaceful protest to expose and publicize global environmental problems and to promote solutions to those problems. Greenpeace campaigns to protect the oceans and ancient forests and to end toxic pollution, global warming, nuclear hazards and genetic engineering.

18. During the period 1998 through 2000, Greenpeace was involved in campaigns across the United States to expose environmental hazards and improve environmental conditions. Some of those campaigns targeted the practices or products of Sasol and Dow Chemical, including Sasol's vinyl chloride production, which emitted toxic chemicals into the Lake Charles region of Louisiana, and Dow Chemical's manufacturing activities, which create dioxin, and the development and sale of products containing genetically modified organisms (GMOs).

19. Because of both financial and public relations concerns about the actions of Greenpeace and other environmental and non-profit organizations, Sasol, Dow, Dezenhall, and Ketchum – assisted by BBI, the individual defendants and other participants in the conspiracy – engaged in an unlawful scheme to obtain confidential information and thus track and potentially disrupt or preempt Greenpeace's campaigns and activities. The participants in this conspiracy – and their activities to implement it – are described below.

### Beckett Brown International's Activities

20. Much of the unlawful surveillance activity described herein was conducted for the Corporate and Public Relations Defendants' benefit by a private security firm called Beckett Brown International ("BBI"). BBI was formed in August 1995. Most of the key executives and employees at BBI were former officers of the Secret Service and the Central Intelligence

Agency. By 1998, BBI had 22 employees working in five different divisions. In or around April

2000, BBI changed its name to S2I Corporation (referred to herein as BBI).

21.     Beginning in or about 1998, CONDEA Vista and Dow paid BBI – either directly

or by paying Defendants Dezenhall and Ketchum, which then paid BBI – hundreds of thousands

of dollars for engaging in the conduct described herein. In return for these payments, CONDEA

Vista and Dow received confidential information that had been misappropriated from

Greenpeace through a variety of unlawful means and received numerous reports on Greenpeace's

financial support, internal operations, plans and activities.

22.     BBI identified Greenpeace as a "target" and, in a 1998 memorandum describing

its activities to monitor "environmental activist groups," stated that the information being

obtained by BBI "provides insight into the scheduling of environmental protests and actions of

the group, corporate targets, the tracking of maritime cargo by the group, and internal political

issues of the group." BBI's accounting records show that BBI spent hundreds of hours collecting

and analyzing information from Greenpeace. Records and correspondence reveal the use of

surreptitious and deceitful methods of data collection, including but not limited to:  pilfering

documents awaiting private trash and recycling collection, placing undercover operatives within

groups, using false pretenses to case offices, procuring phone records, and infiltrating meetings

and electronic mail networks. These records also reveal that BBI relied upon a network of

subcontractors, including off-duty police officers in Washington D.C. and Baltimore, to carry out

this work.

23.     While Greenpeace was a primary target of these unlawful activities, there is

considerable evidence that these tactics were also directed at other non-profit organizations –

including the Center for Food Safety, Friends of the Earth, GE Food Alert, Fenton

Communications, the National Environmental Trust, and the Institute for Agriculture & Trade Policy – as well as individual activists and scientists. Although it is now evident that these unlawful activities continued for years, because of their clandestine nature, and actions by BBI to "sterilize" its records and destroy documents, the full scope and duration of these activities is not known.

24. The unlawful activities directed at Greenpeace were uncovered by *Mother Jones* in 2008, when one of BBI's former principals revealed these activities and made voluminous – albeit incomplete – records of these activities available to BBI's targets and the press. While these records do not reveal the full scope of Defendants' unlawful activities – both because many records have been destroyed and because other unlawful conduct was, in all likelihood, never memorialized on paper – the record that does exist provides extensive documentation of the Defendants' scheme and conspiracy to invade Greenpeace's lawful interests and misappropriate, use and sell confidential information.

### *D-Lines*

25. Defendants acquired internal documents from their targets through actions they referred to as "D-lines." For example, Defendants obtained a steady stream of inside information from Greenpeace as a result of BBI stealing confidential documents and internal records from dumpsters and recycling bins located at Greenpeace's offices. Upon information and belief, D-lines also included the acquisition of documents stolen from Greenpeace's offices or obtained by BBI's employees and/or subcontractors who obtained access to Greenpeace's documents through false pretenses.

26. Defendants Ward, Bly, Mika, and Ferris personally directed and/or conducted D-Lines at Greenpeace's offices in Washington, D.C. They hired subcontractors, including a police

- 8 -

officer for the District of Columbia, James Daron, to assist with the collection of the materials at

Greenpeace's offices in the District of Columbia. Daron was expected to use his official police

badge to gain access to dumpsters that were enclosed by a locked fence. Between July 13, 1998

and July 18, 2000, Defendants Ward, Bly, Mika, and Ferris, or their agents, conducted more than

120 documented D-Lines at Greenpeace's offices. They used Daron in connection with at least

55 of these D-Lines.

27.    Each D-Line conducted at Greenpeace involved trespassing on private property

and stealing documents where Greenpeace had a reasonable expectation of privacy. Indeed, the

scope and nature of these activities – which involved systematic and clandestine efforts to steal

records, often with the help of "off-duty" law enforcement officials, without regard to whether

they were on private property, behind locked fences, in locked or closed containers or otherwise

guarded from public exposure *well over a hundred times over at least a two year period* – shows

utter disregard for Greenpeace's privacy and property interests. The Defendants' conduct

reflected their understanding that these documents would never have been shared with them, and

could only be obtained by clandestine means executed under the cover of darkness. In 2008, an

individual who witnessed these activities described to an investigative reporter one of the

hundreds of occasions in which the conspirators engaged in this intrusion:

> Jennifer Trapnell, who was dating Ward in the late 1990s, recalls an evening
> when she accompanied Ward on a job in Washington D.C. "He said they were
> trying to get some stuff on Greenpeace," she says. Ward wore black clothes and
> told her to dress all in black, too: "It was Mission Impossible-like." ... Ward
> parked his truck in an alley, she remembers, and told her to stay in the truck and
> keep a lookout. In the alley, he met a couple of other men, whose faces Trapnell
> did not see clearly. Ward was talking on a walkie-talkie with others, and they all
> walked off. About an hour later, the men came back and placed two trash bags in
> Ward's car. Trapnell says she didn't know what they did with the bags – and
> Ward never explained.

28.    Between 1998 and May 2000, Greenpeace was located at 1436 U Street, NW,

Washington, D.C. The building's entrances were locked at all times. Greenpeace's recycling

bins and trash dumpster were located on private property. The recycling bins, which were

covered, were located on an elevated loading dock sheltered inside the back façade of the

building. The trash dumpster, which was covered, abutted the building at ground level.

Greenpeace had access to these materials at any time. Greenpeace did not use municipal garbage

collection services. Instead, Greenpeace's recycling and trash were handled by private

contractors licensed by the District. Between 1998 and 2000, Ward, Bly, Mika, and Ferris, or

their agents, conducted more than 100 D-Lines at this office, and police officer Daron

participated in at least 55 of them. The overwhelming majority of these intrusions were

conducted on behalf of Defendants Dow, Sasol (*i.e.*, its predecessor CONDEA Vista), Ketchum

and/or Dezenhall. The "U Street Project Objectives" explicitly included obtaining financial

information about Greenpeace: "funding"; "[d]onors: corporate political, private"; and "money

trails."

29.     In May 2000, Greenpeace moved to 702 H Street, NW, Washington, D.C. The

building's entrances were locked at all times. The recycling and trash bins at this office were

also located on private property, inside the building in a locked ground-floor room. This room

was secured by a locked, exterior, roll-down door that was accessible from an alley; the alley

itself was also secured by a locked gate. While this bay was secured from the interior of the

building as well as from traffic and passers-by on H Street, Greenpeace could have obtained

access to this room at any time. Greenpeace did not use municipal garbage collection services.

Private contractors, licensed by the District, collected the materials contained in the dumpsters

and recycling bins at the H Street office. In 2000, Ward, Bly, and Mika, or their agents,

conducted more than 15 documented D-lines at Greenpeace's H Street office on behalf of

Defendants Dow, Sasol (*i.e.*, CONDEA Vista), Ketchum and/or Dezenhall.

30.     Greenpeace has recovered more than one thousand pages of its own internal documents from BBI's files. On information and belief, this represents only a fraction of what was taken. A former BBI officer has indicated that in late January 2001, defendants Ward and Bly purged BBI's files by shredding many company records. Sometime earlier in November 2000, Ward had communicated with Bly about "sterilizing the office."

31.     The vast majority of Greenpeace's internal documents that were ultimately recovered from BBI were in pristine condition, giving rise to the inference that these documents were not taken from trash dumpsters, but rather from recycling receptacles and/or, as alleged below, from inside Greenpeace's office.

### *Physical Surveillance and Intrusion*

32.     Defendants Ward, Bly, Mika, and Ferris, and/or their agents employed extensive physical surveillance, infiltration and intrusion to obtain information from Greenpeace on behalf of the conspirators.

33.     Ward and Bly sent employees or subcontractors to visit Greenpeace's office under false pretenses.

(a) On November 18, 1998, Mary Lou Sapone, a research consultant hired by BBI, cased Greenpeace's U Street Office while masquerading as a prospective campaign volunteer. In an email to Ward, Sapone described her visit: "I asked for a tour of all 4 floors in order to assess which divisions were largest, and observe all employees in their work space. The public affairs/public education/writing department was the largest in terms of floor space and number of employees observed. . . . I didn't observe any high school or college aged interns. I chose not to ask about intern opportunities. . . . The

- 11 -

in/out board in the reception office indicated that Dave DeRosa (Chicago) was in and Damu Smith was out from 13-23 November." Mary Lou Sapone was unveiled by *Mother Jones* in 2008 as a mole with a history of infiltrating public interest advocacy organizations on behalf of corporate clients; *Mother Jones* reported in 2008 that Sapone worked her way into the top of Ceasefire Pennsylvania and ran for a position on the board of the Brady Center to Prevent Handgun Violence – all while actually working on behalf of the National Rifle Association.

(b) Under the direction of Ward, Mary Lou Sapone hired and trained a retired teacher, Dick Rogers, to use false pretenses to infiltrate a Greenpeace ally working on environmental issues in Louisiana, the Calcasieu League for Environmental Action Now (CLEAN), and gather information on the inner workings and planned activities of the two groups. Rogers began as a volunteer and then served as a CLEAN board member; from these positions, he received, and then forwarded to Sapone, internal, confidential information (copies of correspondence, memoranda and reports). Rogers also provided regular reports of the groups' activities to Sapone. Sapone, in turn, relayed the information provided by Rogers to BBI. BBI incorporated this information into its client briefings.

34.     Under the direction of Ward and Bly, BBI employees monitored and surveilled specific individuals associated with Greenpeace.

(a) BBI employees extensively surveilled Beth Zilbert, a former Greenpeace employee working for CLEAN, a Greenpeace ally based in Louisiana. In BBI's internal records, Zilbert was listed as a "target." On July 10, 1998, Bly sent a letter to Ward discussing the "gathering of intelligence" at Zilbert's residence in Louisiana.

- 12 -

(b)  BBI employees surveilled the Washington, D.C. home of David Fenton, president of Fenton Communications.  Fenton Communications provides public relations and communications services to many non-profit organizations and has long-standing ties to Greenpeace.

(c)  BBI employees investigated or surveilled Greenpeace allies Peter Montague, Lois Gibbs and David Prince, as well as Greenpeace's then-Executive Director.

35.     Upon information and belief, under the direction of Ward, BBI employees or contractors acted in furtherance of the conspiracies described herein by breaking into Greenpeace's U Street offices using the three- and four-digit security codes that unlock office doors.  BBI employees or contractors tested multiple three- and four-digit codes and documented whether each code was successful in granting access to the offices.  The following facts all support the conclusion that BBI unlawfully entered Greenpeace's offices:  (a) BBI sent an operative into Greenpeace's offices under false pretenses to case the offices; (b) BBI obtained and maintained information about the confidential security codes for Greenpeace's internal U Street office; (c) BBI maintained information showing that it had determined and/or confirmed which of these confidential security codes worked for internal offices at this location and which were no longer operative;  (d) BBI procured and held highly confidential Greenpeace records – including, for example, confidential personnel, financial and employment records – which could only have been secured from Greenpeace's offices; and (e) BBI's clandestine activities at other locations (described below) corroborate its practice of breaking into private property to procure confidential information maintained by its "targets."

***Electronic Surveillance***

36.     Upon information and belief, Bly, Mika, and Ferris, or their agents, engaged in

electronic surveillance of Greenpeace, including the wiretapping of phones and hacking into of computers.

37.     Among the Greenpeace internal documents and research files maintained in BBI's offices was a file labeled "Wire Tap Info."

38.     A former BBI employee, Eric Pikus, has testified that during the course of his work at BBI, he would tape-record telephone conversations.

39.     BBI hired TriWest Investigations to procure the phone call records of Greenpeace employees or contractors.

40.     BBI obtained the records of cellular phone calls placed and received by Greenpeace employees or contractors from Greenpeace's cellular phone provider.  For example, BBI obtained a list of calls made to and from Beth Zilbert's cell phone, which was paid for by Greenpeace.

41.     Ward and Mary Lou Sapone considered acquiring, and may have acquired, a computer program called Data Interception by Remote Transmission ("DIRT"), which allows the user to "monitor and intercept data from any PC in the world anytime you want."  DIRT is marketed as ideally suited for industrial espionage.  A proposal to acquire hacking software was also presented to BBI's directors.

42.     Under the direction of Ward, BBI purchased the services of NetSafe, Inc., a company that specializes in computer intrusion and electronic surveillance, for work on its Greenpeace projects.  Most of NetSafe's top executives were former National Security Agency employees, including Joe Patanella.  On August 5, 1999 a check for $4,000 was issued to and signed by Richard Beckett; the purpose of the check was noted as "Patanella – GP."  Other BBI records indicate that the check was issued for "Cash" for "Joe Patanella."

43.     Upon information and belief, BBI conducted proactive surveillance of Greenpeace with listening devices and/or other electronic equipment for Dezenhall and other clients. In or around January 1999, BBI created an internal billing/account code for Technical Surveillance Counter-Measures or "TSCM" – a term of art in the security industry that encompasses methods of detecting electronic surveillance (*e.g.*, sweeping for bugs, radio signals and other evidence of wiretaps). On information and belief, BBI used the term TSCM to cover its offensive electronic surveillance activities.

44.     Beginning in January 1999, the descriptions of Mika's field work changed from "D-Lines" to "Research," and on multiple occasions, Mika charged the TSCM account – *i.e.*, the account pertaining to electronic surveillance – during the very period in which he was conducting surveillance of Greenpeace's offices. Mika briefed Dezenhall about Greenpeace shortly after conducting this "research." BBI's briefing reports to Dezenhall and Ketchum appear to reflect enhanced collection capability after the establishment of the TSCM account; BBI's file notes and the reports provided to clients during this period include *verbatim quotes* attributed to specific Greenpeace employees.

45.     During 1999, BBI employees met with Dezenhall and Ketchum to discuss TSCM and wrote a proposal for "intrusion and survey" specifically for Ketchum.

### *Stolen Confidential Information*

46.     As a result of Ward, Bly, Mika and Ferris, or their agents, ordering and conducting unlawful D-Lines, physical intrusions and electronic surveillance, Defendants obtained a variety of confidential, internal, Greenpeace documents, including: campaign planning documents; confidential donor letters and records of contributions; internal communications; confidential legal memoranda; privileged attorney-client communications;

- 15 -

financial reports, balance sheets and budgets; passwords for private electronic mailing lists;

Greenpeace credit card account numbers; and highly-sensitive personal information about

Greenpeace employees such as Social Security Numbers, personal bank account statements and

employment agreements. Many of these documents were tightly guarded within Greenpeace and

would only have been accessible to a limited number of employees; such documents would not

have been discarded as garbage or recycling in the ordinary course of business and could not

have been obtained merely by rummaging through bins.

47.     Many of the documents that Defendants unlawfully obtained from Greenpeace

contain confidential strategy information regarding environmental campaigns against toxic

chemicals, global warming, nuclear energy, genetic engineering and the pollution of fisheries

and oceans. Such campaigns directly and indirectly concern the financial interests of Dow,

Sasol, Ketchum and Dezenhall.

48.     Some of the specific campaign strategy documents that Defendants unlawfully

obtained from Greenpeace include: Toxics Campaign Meeting Agenda for February 2, 1999;

Genetically Modified Organisms Campaign Strategy; Global Warming Strategy; Climate

Campaign Ship Tour Draft Schedule; Communications Plan for Great Bear Rain Forest

Campaign; Greenpeace Southern Strategy Update; and Preservation of Whales Campaign.

49.     As a result of Ward, Bly, Mika, and Ferris, or their agents, ordering and

conducting unlawful D-Lines and, on information and belief, physical intrusions, Defendants

obtained a variety of confidential, internal documents from Greenpeace ally Fenton

Communications, including: billable time summary reports, reflecting the work performed for

Fenton clients; internal fee memoranda, which provide instructions for invoicing particular

clients; draft invoices for clients; timeslip reports, which document the billable hours of each

employee; and a check for the reimbursement of a health insurance claim for David Fenton, which was mailed to his home address.

### *Sharing the Confidential Information*

50. Dow, CONDEA Vista, Ketchum and/or Dezenhall paid for the vast majority of D-Lines and physical and electronic surveillance and intrusions of Greenpeace that BBI conducted. BBI billed Dezenhall and Ketchum with account-specific, monthly invoices.

51. From 1998 through 2000, Ward regularly briefed Andy Shea of Dezenhall, Tom Donnelly of Ketchum and Peter Markey of CONDEA Vista about the information unlawfully obtained from Greenpeace. On occasion, Mika, Bly, Ferris and another employee, Sarah Slenker, assisted Ward with the briefings. In addition to in-person briefings, BBI produced written reports which began with the advisory, "The following information was supplied by confidential sources and should be used with great discretion." From this advisory and the content of these reports, which included prospective plans and budgets and reflected internal debates and dynamics, Dezenhall and Ketchum knew of the unlawful means employed to procure the information presented to them and/or consciously avoided asking about details of how the information was procured so that they could maintain plausible deniability.

52. From October 1998 until July 1999, Dezenhall paid BBI approximately $150,000 to work on the "U Street Project." On information and belief, Dezenhall was acting on behalf of a number of clients and/or with a plan to sell the information to clients. The objective of the U Street Project was to gather information from Greenpeace's U Street office about the organization's campaigns against the manufacture and sale of plastics containing polyvinyl chloride; its donors and funding sources; its connections with the United States Attorney General and other regulators in federal government; and its political support. Mika and/or his agents

- 17 -

conducted approximately 60 D-Lines for the U Street Project, and Ward and Mika briefed

Dezenhall about the information that they had unlawfully obtained. Work on the U Street

Project was also done on behalf of Dow and Ketchum and paid for by Ketchum. Ketchum was

briefed about information derived from the U Street Project.

53.    Confidential information obtained by BBI for Dezenhall and Ketchum was

subsequently distributed to their clients, CONDEA Vista and Dow Chemical. On occasion,

Ward and his employees met directly with CONDEA Vista and Dow Chemical to discuss their

surveillance of Greenpeace and the information they had secured.

54.    This information was not only used by BBI, Dezenhall and Ketchum in

connection with CONDEA Vista and Dow, it was also used by at least BBI and Dezenhall to try

to secure new clients for their surveillance and "public relations" work. For example, BBI

documents indicate that on August 24, 1998, Ward spent five hours "marketing w/ND [Nichols

Denzenhall] – GP [Greenpeace] intelligence." Another document records Ward's "marketing

GP [Greenpeace] network." In August 1998, Ward and Richard Beckett of BBI had a

"marketing meeting" with Ketchum Public Relations in Ketchum's Washington, D.C. offices. In

the same month, BBI held a marketing meeting at Dezenhall's offices to offer its intelligence to

Aristech, a major acrylics manufacturer. During this same period, BBI's records reflect

marketing efforts and plans directed at other major manufacturers that had been the subject of

Greenpeace environmental campaigns, including Boise Cascade, PPG, Monsanto and General

Electric.

55.    The activities described above were conducted pursuant to conspiracies involving

the Defendants in this case. Although there is substantial overlap between these conspiracies

(for example, the common use of BBI and the pursuit of activities that were undertaken – and in

many cases paid for – to benefit both Dow and CONDEA Vista) – this conduct can also be understood as involving two separate, but closely related conspiracies: a conspiracy involving CONDEA Vista, Dezenhall, BBI and the individual defendants; and a related conspiracy involving Dow, Ketchum, BBI and the individual defendants. Although the two manufacturers involved had their own facilities and financial interests, in each case the objective was to secure confidential information from Greenpeace by all necessary means, whether lawful or unlawful, to undermine its environmental campaigns.

**The Dezenhall-CONDEA Vista (Sasol) Accounts**

56.     Between 1984 and 2001 CONDEA Vista (now Sasol) operated a vinyl chloride manufacturing facility in Lake Charles, Louisiana. The manufacture of vinyl chloride released dioxins and other toxic chemicals directly into the environment or indirectly through incinerator emissions, causing environmental damage and raising health concerns in the region. In 2001, a division of the U.S. Environmental Protection Agency found levels of the toxic compound vinyl chloride in the air in the Lake Charles town of Mossville at concentrations 100 times what is permitted by federal law, and ethylene dichloride at 20 times the level of permissible concentrations. Studies show that the community has suffered from high rates of cancer, upper respiratory problems and reproductive health problems.

57.     During the period that CONDEA Vista hired BBI to monitor Greenpeace's activities, Greenpeace was campaigning to expose the hazards of vinyl chloride production and the environmental damages caused by CONDEA Vista in the Lake Charles region of Louisiana. As part of its campaign, Greenpeace: conducted an investigation into toxic chemical contamination in the Lake Charles environment; provided outside observers, medical experts, documentarians, and grassroots organizers to publicize the contamination of the Lake Charles

region; and urged the EPA to focus on CONDEA Vista's facilities and vinyl chloride production in its Dioxin Reassessment report.

58.     It is not surprising that CONDEA Vista engaged Dezenhall for help in securing confidential information about environmental campaigns affecting its plant in Louisiana. Dezenhall had an industry reputation as a "public relations" company that was prepared to do far more than simply report and act on publicly available information for its clients.  As Eric Dezenhall told the *Washington Post* in 1999: "We are the last resort, the Navy SEALs of the communications business."  In an article in *Business Week*, Eric Dezenhall was described as "the pit bull of public relations."

59.     On May 26, 1998, working at the behest of both CONDEA Vista and Dezenhall, BBI initiated the "Lake Charles Project" to secure confidential information about environmental organizations and campaigners, including Greenpeace and its employees for CONDEA Vista.

60.     Peter Markey, an executive who reported directly to the president of CONDEA Vista during the relevant time period, has testified under oath that he hired BBI to "infiltrate activist groups" that were drawing attention to the environmental hazards created by CONDEA Vista's manufacturing activities in Louisiana and that he instructed BBI to "find out what you can find out."  In selecting BBI, he was aware of its "surveillance experience" and that it was a "surveillance operation."

61.     Similarly, Dezenhall was well aware of what it was buying for its client, CONDEA Vista, in engaging BBI.  Not only did BBI and Dezenhall have joint marketing plans and meetings, they had extensive and repeated discussions about BBI's activities.  In fact, BBI's internal records make clear its status as a go-to company for Dezenhall.  BBI records include at least 35 Dezenhall accounts – many cryptically named – during the relevant time period.  Key

players at these companies met and talked on a regular basis. Dezenhall knew exactly what it was getting when it engaged BBI and successfully recommended that its client, CONDEA Vista, do so as well.

62.     Ward managed the Lake Charles Project, and his work constituted approximately two-thirds of BBI's total billable hours on the project. He repeatedly met with and briefed Peter Markey about the status of and information obtained from the Lake Charles Project. During these meetings, Markey reviewed documents and information that BBI had stolen from Greenpeace. Markey has admitted that the president and general counsel of CONDEA Vista were among the tight circle of officials at CONDEA Vista knowledgeable about the company's relationship with BBI.

63.     During the period BBI and Dezenhall were engaged in the activities described above, bills for these unlawful activities were often sent to and paid for by CONDEA Vista. Confidential information secured from these activities was provided, in written reports sent in interstate mails and telephone reports made in interstate calls, to CONDEA Vista officials, including Markey. Markey also traveled to Maryland to meet with BBI regarding these unlawful activities.

64.     In addition to work that was billed directly through Dezenhall, CONDEA Vista's payments to BBI for the "Lake Charles Project" included, for example, payment of $9,000 "for services rendered" on or about September 9, 1998; $12,237 on or about December 22, 1998; $10,000 on or about May 26, 1999; $10,000 on or about June 8, 1999; $10,000 on or about August 3, 1999; $7,278.75 on or about August 24, 1999; $10,000 on or about August 31, 1999; $10,000 on or about September 10, 1999; $10,000 on or about September 21, 1999; and $5,000 on or about November 2, 1999. Dezenhall also made numerous payments – involving well over

$100,000 – during the period 1998-2000 to BBI in connection with the Lake Charles Project. As part of the Lake Charles Project, BBI conducted D-Lines, physical and electronic surveillance and intrusions at Greenpeace's offices as set forth above.

65.     Between July 13, 1998 and November 12, 1998, Ward, Mika, and Ferris and/or their agents conducted at least 35 D-lines at Greenpeace's offices for the Lake Charles Project, collaborating on the pick-up, review and client briefings. On June 26, 1998 and August 3, 1998, Ward purchased "investigative supplies" to assist with the D-line collections.

66.     As part of the Lake Charles Project, BBI hired Mary Lou Sapone, who in turn hired Dick Rogers with orders to infiltrate Greenpeace ally CLEAN. Rogers was trained by Sapone "to be inquiring, but not participatory . . . to seek documents, ID friends and foe legislators and regulators, follow money trails, ID informants, discover future targets and campaign design, ID activists' chain of command, discover plans for illegal activity and civil disobedience, discover support from national groups, and generally discover 'what they know'." In BBI internal records, CLEAN was identified as one of the "targets" of BBI's activities.

67.     Posing as a concerned citizen, Rogers managed to get elected to CLEAN's board. From that position, he monitored the activities of Greenpeace, including communications between CLEAN and Greenpeace, and attended a confidential meeting sponsored by Greenpeace in Washington, D.C. Rogers sent more than 65 narrative reports and forwarded at least 150 confidential emails to Sapone. Sapone, in turn, forwarded the confidential emails and reports, almost daily, to Ward between August 1998 and November 1999.

68.     In 1998, Jay Bly traveled to Louisiana to surveil the offices and homes of activists working in Lake Charles. He submitted numerous reports detailing his activities, which involved trailing the activists and recording their activities and collecting and sorting trash from various

locations. In 1999, Bly was reimbursed for supplies purchased in Maryland in connection with his CONDEA Vista investigations: AAA batteries, trash bags, a trash can and keys. Since the purpose of this work was to gather confidential information about Greenpeace for CONDEA Vista, the charge to CONDEA Vista for making "keys" provides further support for the conclusion that BBI was unlawfully gaining access to Greenpeace premises, or property related to Greenpeace, that it had no lawful right to access.

69.    As part of the Lake Charles Project, BBI hired Russ Andrews of TriWest Investigations to obtain the call records from Mercury Cell Phones for telephones leased by Greenpeace for environmental activists in Louisiana campaigning for the remediation of CONDEA Vista's chemical spill, as well as for other Greenpeace cell phones serviced by Bell South and MCI. Andrews provided handwritten and typed logs of the calls made from these phones.

70.    BBI shared its findings with its Lake Charles clients in briefings, advising the clients of Greenpeace's recent and planned activities. For instance in August 1998, BBI reported to its clients: that GP had been searching the EPA's ERNS database for information about toxic spills in Lake Charles; the substance of a meeting between Greenpeace and Shintech, a PVC producer based in Louisiana; Greenpeace's plan to review the objectives and strategies of its own Toxics Campaign; Greenpeace paid the expenses of a Louisiana activist to attend a Persistent Organic Pollutants convention in Montreal. BBI also informed its clients that it had obtained logos of potential banners that Greenpeace and CLEAN planned to use in the Lake Charles area. Peter Markey has admitted that BBI sent packets of information to him at CONDEA Vista that included internal, confidential Greenpeace emails for his review.

71.    Dezenhall also received regular and extensive briefings of the work being done on

behalf of CONDEA Vista and Dezenhall. For example, during the period July 1998 through April 1999, BBI's internal records include charges for "client briefing[s]" or "UC briefing" [i.e., undercover briefing] by BBI's Ward on: July 10, 1998; July 17, 1998; August 7, 1998; August 10, 1998 ("client briefing/overview (ND)"); August 12, 1998; August 13, 1998 ("client meeting DC/information gathering"); August 20, 1998; August 25, 1998; August 28, 1998; September 11, 1998; September 12-14, 1998; September 22, 1998; October 16, 1998; October 30, 1998; November 6, 1998; November 12, 1998 ("client meeting/project review@ND"); November 20, 1998; December 1, 1998; December 8-10, 1998; December 18, 1998; January 8, 1999; January 15, 1999; January 19, 1999; January 29, 1999; February 1, 1999; February 5, 1999; February 16, 1999; February 19, 1999; February 22, 1999; February 26, 1999; March 1, 1999 and March 3, 1999.

72.     During that period, Dezenhall paid approximately $150,700 to BBI for the Lake Charles Project on behalf of client CONDEA Vista. These payments were authorized by Maya Shackley, a Senior Vice President at Nichols-Dezenhall. Ms. Shackley has admitted under oath that BBI's invoices were "intentionally vague" because Nichols-Dezenhall did not want "specific information" appearing in the invoices. Ms. Shackley has also testified that this lack of specificity was requested by Nichols-Dezenhall's clients, who wanted "vague" invoices. Ms. Shackley admitted under oath that Dezenhall's practice was to "immediately turn around payment to [BBI] as soon as [Dezenhall's] clients paid [Dezenhall]," giving rise to the reasonable inference that Dezenhall billed, and was paid by, CONDEA Vista for work on the Lake Charles Project before paying BBI.

73.     After March 15, 1999, BBI directly billed CONDEA Vista for its services. CONDEA Vista paid approximately $65,000 directly to BBI for the Lake Charles Project.

- 24 -

74.     During the same period it was engaged in this "information gathering" on behalf of Dezenhall and CONDEA Vista, BBI also conducted surveillance and appears to have broken into the offices of the law firm of Cox, Cox & Filo in Louisiana. In BBI's internal records, the Cox, Cox & Filo law firm was listed as one of its targets. At this time, the firm was involved in litigation against CONDEA Vista on behalf of cleanup workers exposed to ethylene dichloride after a massive (19 to 47 million pounds) spill from a CONDEA Vista/CONOCO pipeline.

75.     From May to September 1998, the law offices of Cox, Cox & Filo were broken into and records, including client files and other sensitive materials relating to the pending litigation, were stolen. When BBI records later became available, in 2008, confidential records from the law firm were found in the BBI files. The BBI records confirmed that the "information gathering" work done by BBI was being done on behalf of Dezenhall – almost certainly on behalf of CONDEA Vista (a defendant in the matter that Cox, Cox & Filo was litigating and that stolen confidential records pertained to) – and BBI was providing briefings on these materials.

76.     Timothy Ward has admitted that all information that was obtained by BBI in Lake Charles, Louisiana by Ward or Bly "or anyone else associated with Beckett Brown" was obtained with "the consent, permission and expressed authority" of CONDEA Vista and that, to the best of his knowledge, he is absolutely certain that "Beckett Brown didn't do anything in Lake Charles associated with the work for Conde[a] Vista that was not specifically at Conde[a] Vista's direction[.]"

77.     As the foregoing reflects, both CONDEA Vista and Dezenhall participated in a conspiracy with BBI and the individual defendants to secure confidential records from Greenpeace by unlawful means, took significant steps in furtherance of these activities and the conspiracy, and knew that BBI would engage in the unlawful activities described above and/or

- 25 -

were willfully blind to the illegality of those actions.  This is reflected in, and evidenced by, the

following facts:

- CONDEA Vista and Dezenhall's knowledge of BBI's surveillance operations and

  the blanket instruction to BBI to "find out what you can find out";

- Repeated meetings, calls and other communications in which BBI briefed

  CONDEA Vista and Dezenhall on its activities and the confidential information it

  was securing regarding Greenpeace;

- CONDEA Vista and Dezenhall's payments of large sums – more than $200,000

  in total – to finance the unlawful activities engaged in by BBI;

- CONDEA Vista and Dezenhall's continuing participation in these activities,

  including both financing the activities and the briefings described above, for a

  sustained period of time in at least 1998 and 1999;

- The deliberate use of veiled terminology to describe BBI's activities – activities

  that CONDEA Vista and Dezenhall were fully aware of and/or over the course of

  dozens of reports, briefings and/or meetings chose to disregard.  CONDEA Vista

  and Dezenhall not only paid for and were briefed on BBI's activities, they were in

  a position to secure as much detail as possible about the illegal activities they

  were financing.  If any details were unknown to them, this would be because they

  deliberately chose to engage in conscious avoidance of the details.

78.     CONDEA Vista and Dezenhall not only conspired with BBI and the individual

Defendants, they also aided and abetted their unlawful activities by financing those activities,

participating in meetings, briefings and/or other communications with the conspirators, and

making clear the nature of information that they wanted to secure through the activities of the

conspiracy.

## The Ketchum-Dow Account

79.     During this same period, BBI and the individual defendants were engaged in

many of the same (and other very similar) activities targeting Greenpeace on behalf of

defendants Dow Chemical and Ketchum.  Each of these Defendants participated and acted in

furtherance of a conspiracy to obtain confidential information from Greenpeace by unlawful

means.

80.     Dow Chemical is the world's largest producer of chlorine, and it uses the

chemical to manufacture other products.  A byproduct of manufacturing with chlorine is the

emission of dioxin, a carcinogen.  In October 1993, the American Public Health Association

unanimously passed a resolution urging companies to halt manufacturing with chlorine.  Dow

Chemical is also a major producer of GMOs.  The safety of GMOs in the food supply has been

questioned by multiple public interest organizations, and several counties around the United

States have banned the farming of GMOs.

81.     During the period in which Ketchum and Dow Chemical hired BBI to secure

confidential information about Greenpeace's activities, Dow Chemical was a major subject of

Greenpeace campaigns to phase out the use of chlorine.  Between 1995 and 1999, Greenpeace

published numerous reports identifying the dangers of dioxin and criticizing Dow Chemical for

using chlorine in its manufacturing processes.  Greenpeace was also aggressively campaigning

against the spread of GMOs in the United States.  Greenpeace focused much of its campaign on

persuading the federal government to regulate the GMO industry and to require the labeling of

food products containing GMOs.

82.     On August 14, 1998, Ward and Richard Beckett of BBI met with representatives

of Ketchum Public Relations at Ketchum's Washington, D.C. offices for a "marketing meeting." Less than four weeks after that meeting, BBI began billing its unlawful surveillance and intrusions at Greenpeace's U Street offices to Ketchum. These unlawful activities were used to provide confidential information to Ketchum's client, Dow Chemical, about Greenpeace's activities.

83.    BBI conducted D-Lines and surveillance of Greenpeace to provide information to Dow Chemical, typically through Ketchum Communications, about Greenpeace's activities.

84.    Ward managed the Ketchum-Dow account, and he and Bly conducted regular client briefings about the information that was unlawfully obtained from Greenpeace for Dow. BBI records show that Ward's work for the account includes, for example, "client briefings," "UC [undercover] briefings, client meeting," "intelligence briefing," "lunch with the client and other BBI employees," "and "IT Conf Call (Dow)." Ward briefed his clients dozens of times, including: September 18, 1998; September 21, 1998; September 22, 1998; September 23, 1998; September 28, 1998; October 20, 1998; October 30, 1998; November 16, 1998; December 2, 1998; December 7, 1998; December 8, 1998; January 13, 1999; January 19, 1999; February 12, 1999; February 24, 1999; March 1, 1999; March 4, 1999; March 22, 1999; June 16, 1999; June 18, 1999; and September 18, 1999.

85.    Between September 1998 and October 2000, Ward, Bly, and Mika and/or their agents conducted more than 100 D-Lines at Greenpeace's offices for the Ketchum-Dow account. The D-Lines were conducted at both Greenpeace's U Street office and H Street office. Moreover, unlawful surveillance activities being conducted for the Lake Charles Project and the U Street Project described above were also being conducted for, and billed to, Ketchum on behalf of its client, Dow. During the same period, BBI employee Sarah Slenker alone billed time

to the Ketchum-Dow account on hundreds of dates, typically with a cryptic entry such as "Dline – GP/Dow"; "GP/Dow"; "info collection and analysis"; "client brief"; "Dow project, info collection"; "Dow information, Dline"; "Dow information"; and "report research and prep, Dline."

86.     Many of the D-Lines conducted for the Ketchum-Dow account were facilitated by and included improper payments to two off-duty police officers from the District of Columbia and the Baltimore Police Department.  For example, dozens of D-Lines, including D-Lines at both Greenpeace's U Street and H Street offices, were conducted for this account by James Daron, a District of Columbia police officer.

87.     Although the records that were recovered at BBI are incomplete, they reveal that clandestine activities were undertaken for Defendant Dow (as well as the public relations company it had retained, Ketchum).  For example, on more than 150 dates, Slenker's logs acknowledge that work for the Ketchum account is being performed for Dow or describe the work as the "Dow Project" or "GP/Dow."

88.     The surviving documents from BBI also include numerous records showing that during this period BBI was delivering documents to Ketchum for the "Dow Project."  For example, BBI records reflect expense reimbursements to BBI for UPS packages sent to Ketchum on at least six occasions, including a package sent to Kathy Jeavons, a Ketchum account manager.  These shipments were made at the same time Sarah Slenker's work log described her work for Ketchum as the "Dow Project."

89.     On July 28, 1999, at the Loew's Hotel in Annapolis, MD, BBI participated in a client briefing with representatives of Ketchum and Dow Chemical to discuss the ongoing surveillance of Greenpeace and other environmental organizations critical of, or likely to

- 29 -

criticize, Dow Chemical.  On information and belief, this meeting included Dow's then-Global

Vice President for Public Affairs, Elin Miller, who had expressed a particular desire to be briefed

on Greenpeace.  Ward, Slenker and Bly attended the meeting and delivered a power-point

presentation about Greenpeace which included confidential, prospective budget information and

campaign plans.

90.     Following the meeting in Annapolis, Ketchum established the "Dow Global

Tracking System" and created a "Dow Chemical Trends Tracking Team" comprised of

employees of BBI, Dow Chemical, Ketchum and the research firm Allis Information

Management.  The team – including Tom Donnelly of Ketchum and Joy Hutchinson and

Michael Webster of Dow Chemical – held meetings and tracked the activities of Greenpeace,

particularly regarding genetic engineering issues.

91.     In a memo circulated to "Dow Global Trends Tracking Team Members," BBI's

responsibility on the team was summarized as "primarily discussions among activist groups on

the issues being tracked."  Donnelly also advised BBI that the Dow Trends Tracking project was

"not a clipping service."  Rather, the purpose of the Trends Tracking reports was "to provide

senior [Dow] managers with a tool that assesses the current issues that Dow has on their [sic]

radar screen and provides an analysis of where the issue is likely to go . . . If an issue is dormant,

the system will show it and Dow will be able to divert resources to more pressing matters."

92.     Dow encouraged Ketchum to be aggressive in gathering information about its

targets.  In September 1999 after reviewing a Ketchum report on INFACT (a public interest

group currently known as Corporate Accountability International), Dow conveyed

disappointment.  Dennis Heydanek of Dow's Public Policy Systems communicated to Michael

Webster and Joy Hutchinson of Dow:  "This is a start.  OPPO research is one of Elin [Miller]'s

pet areas of interest . . . I've always had Mongoven a notch above Ketchum when it comes to getting the 'rest of the story' on a person or an opposition group. If this is what we get for $480,000/yr. . . ." This communication was forwarded by Hutchinson to Tom Donnelly.

93.     On October 6, 1999, the Dow Trends Tracking Team held a strategy meeting at Dow Chemical's headquarters in Midland, Michigan. At the meeting, the Team decided that BBI would prepare weekly reports for Ketchum, which would incorporate the information into reports produced for the Team. These reports were being prepared for Ketchum and Dow at the same time that BBI was unlawfully securing confidential information on their behalf from Greenpeace's offices. During the last three months of 1999 and throughout 2000, Slenker produced weekly or bi-weekly reports for Ketchum for the Dow Trends Tracking Team.

94.     In December 1999, Tom Donnelly of Ketchum warned BBI that it should not send email to his normal business address at Ketchum, but should instead use one of two Hotmail addresses. Donnelly was aware that Ketchum's records might be reviewed by the Federal Trade Commission in the course of investigating a proposed Dow merger and wanted to be sure that information coming from BBI would not be seen. Donnelly provided two email addresses: one based on his name and a second, anonymous, address for "really sensitive information."

95.     Between October 30, 1998 and January 31, 2001, Ketchum paid BBI more than $125,000 to obtain confidential information from Greenpeace for its client Dow Chemical. Ketchum's payments to BBI include payments on the following dates: January 11, 1999 – $5,000; January 15, 1999 – $7,000; May 17, 1999 – $4,030; May 18, 1999 – $4,030; June 22, 1999 – $10,000; July 20, 1999 – $5,000; August 9, 1999 – $5,000; September 20, 1999 – $17,000; November 15, 1999 – $10,000; January 7, 2000 – $10,000; January 14, 2000 – $5,000; February 9, 2000 – $5,000; April 27, 2000 – $5,000; May 1, 2000 – $5,000; May 8, 2000 –

$4,000; July 10, 2000 – $4,000; July 14, 2000 – $4,000;  August 15, 2000 – $4,000; October 10,

2000 – $8,000;  January 10, 2001– $4,000; January 22, 2001 – $4,000;  January 30, 2001 –

$4,000.

96.    Correspondence between Ketchum and BBI indicates that these charges were

ultimately paid by Dow Chemical.  For example, in November 2000, Ketchum advised BBI that

Dow "closes its books early" and asked BBI for all Global Trends Tracking Project invoices so

that Ketchum "[c]ould . . . bill Dow for all services rendered in 2000 by the end of the year."

97.    Like Dezenhall, Ketchum was well aware of the nature of BBI's clandestine

activities.  This is reflected in an email exchange between Timothy Ward and Jay Bly on

September 26, 2000:

> Received a call from Ketchum yesterday afternoon re three sites in DC.  It seems
> Taco Bell turned out some product made from bioengineered corn.  The
> chemicals used on the corn have not been approved for human consumption.
> Hence Taco Bell produced potential glow-in-the-dark tacos.  Taco Bell is owned
> by Kraft.  The Ketchum Office, New York, has the ball.  They suspect the
> initiative is being generated from one of three places:
>
> 1. Center for Food Safety, 7th & Penn SE
>
> 2. Friends of the Earth, 1025 Vermont Ave (Between K & L Streets)
>
> 3. GE Food Alert, 1200 18th St NW (18th & M).
>
> #1 is located on 3rd floor.  Main entrance is key card.  Alley is locked by iron
>    gates.  7 dumpsters in alley – take your pick.
>
> #2 is in the same building as Chile Embassy.  Armed guard in lobby & cameras
>    everywhere.  There is a dumpster in the alley behind the building.  Don't know
>    if it is tied to bldg. or a neighbor property.  Cameras everywhere.
>
> #3 is doable but behind locked iron gates at rear of bldg. . . . Site #2 is a long shot
>    complicated by the Embassy thing.  Site #3 is doable if we can get some help
>    from our friends who ride the truck.

98.    In this email communication, Bly made clear that Ketchum wanted them to secure

non-public information about the plans of the environmental organizations involved: "Apparently there is an article or press release due out next week and [Ketchum] would like some pre release information." He states that "I want to send Sarah [a BBI employee] to site #1 for a job inquiry. She can see how big the office(s) are and get the lay of the land. Maybe this will narrow the field. If they have a job opening could she work there for two or three days to find out what's going on." With respect to the Friends of the Earth site, Bly stated that "I'm sitting on the building at 4:00 am tomorrow morning (if Ketchum gives us a budget.)" On the following day, Bly indicated that he had determined that the second site would be "doable." On September 28th, Ward communicated to Bly that "once Jim [Daron, the D.C. Police Officer] calls you back we will know where we stand. *If he can't get in with the shield, it will be difficult at site #1.* I think #2 we can do regardless. . . . Don't forget our GP [Greenpeace] boy in Baltimore has been handling the work for GP. . . . Maybe one of our BPD [Baltimore Police Department] guys can hit that one. When you talk with the client push the fact that their client (the cheese people) . . . should put together a trend tracking program for the future."

99.     This exchange reveals BBI and Ketchum's *modus operandi* in several respects. First, it indicates that the fact that the information being sought was located behind locked iron gates or was otherwise safeguarded did not dissuade BBI from securing it. Second, BBI would have its operatives gain access to a target's offices by false pretenses to "get the lay of the land" and "find out what's going on." Third, BBI did not act until Ketchum provided a budget – *i.e.*, provided financial authorization – for its clandestine activities. Fourth, BBI did not hesitate to use off-duty police officers to "get in with the shield" in order to secure confidential business information that it could not lawfully obtain.

100.    As these events reflect, Dow Chemical and its public relations company, Ketchum – like CONDEA Vista and Dezenhall – conspired with BBI and the individual defendants to secure confidential records from Greenpeace by unlawful means, took significant steps in furtherance of these activities and the conspiracy, and either knew that BBI would engage in the unlawful activities described above and/or were willfully blind to the illegality of those actions. The conspirators' knowledge and participation in these activities is evident from the following:

- Ketchum paid BBI more than $125,000 for engaging in the unlawful activities described above and almost certainly billed Dow for these unlawful activities;

- The confidential information being secured by BBI was provided to Ketchum and/or Dow in mailings, meetings and regular reports;

- These unlawful activities were being undertaken to secure confidential information for Dow (for Ketchum's financial benefit as well) and BBI's internal records reveal that these activities were for "Dow," the "Dow Project" and "Dow/GP."

- In July 1999, a Global Vice President of Dow Chemical, as well as officials from Ketchum and BBI, met to discuss BBI's ongoing surveillance activities and confidential information obtained from Greenpeace;

- A meeting among the conspirators was conducted at Dow Chemical's headquarters in Midland, Michigan and BBI was directed to prepare weekly reports about Greenpeace for Ketchum, at the very same time that Ketchum and/or Dow were financing BBI's unlawful surveillance, intrusions and procurement of confidential information from Greenpeace;

- A Ketchum official directed BBI not to communicate information to Ketchum at its regular business address in order to avoid possible detection by regulatory officials of the United States government;

- BBI's internal communications show that it did not act without Ketchum's approval and financial authorization and that it was specifically directed by Ketchum to obtain confidential information from its targets;

- BBI engaged in the activities described above on more than one hundred occasions, over a period of more than two years, for the benefit of both Ketchum and Dow, and during that period was providing numerous reports to those companies. Throughout this extended period of unlawful conduct, Ketchum and Dow either knew this confidential Greenpeace information was being secured by the unlawful methods described above and/or acted with willful blindness and deliberate disregard for the unlawful means by which BBI was procuring confidential documents and information.

101. Dow and Ketchum not only conspired with BBI and the individual Defendants, they also aided and abetted their unlawful activities by financing those activities, participating in meetings, briefings and/or other communications with the conspirators, and making clear the nature of information that they wanted to secure through the activities of the conspiracy.

**A Pattern of Covert Surveillance, Infiltration,**
**Deceit and Misappropriation of Business Information**

102. Nichols-Dezenhall approached BBI as early as 1996 proposing a "joint venture" in which Nichols-Dezenhall and BBI would gather and "exploit" intelligence for corporate clients. The proposed target (*i.e.*, buyer) for these services was "risk-oriented, top-level managers who either view decisive action as a necessary last resort or, preferably, as a prophylactic course of action." Dezenhall emphasized the importance of discretion and the

ability to both manage intelligence-based services and keep "a certain distance" from those services as reasons for considering a joint venture separate entity from Nichols-Dezenhall.

103.    Shortly after beginning surveillance work for BBI, Ferris advised BBI investigators to obtain false IDs from a source recommended by him, to purchase equipment that could generate photo credentials and work order forms, and to procure "generic work uniforms" to assist in visits to the offices of targets.

104.    In March 1999, BBI was working on pitches for a project called "Active Intelligence Collection" which was described as follows: "BBI proposes to initiate a discrete [sic], long-term program of active intelligence collection that will provide client with information on the plans and intentions of the international environmentalist movement. This sensitive all-source intelligence collection effort, mounted from outside the US, will be focused on specific foreign-based organizations  Our objective will be to colect [sic] reliable warning and indication information on the specific issues of interest to client.  BBI will design all aspects of this program and provide client with regular updates based on the relevant intelligence obtained. Safeguards will be designed into the program to ensure that the client's interest in the environmentalist movement will not be revealed."

105.    In April 1999, BBI provided a report to Mongoven Biscoe & Duchin on Greenpeace's plans to protest a Boise-Cascade board meeting to bring attention to the company's poor environmental record and plans to build a chip mill in the rainforests of Chile.  The report was headed with the advisory, "ALL of the following information is strictly internal GP information."

106.    In 2000, Montgomery Sapone (a/k/a Montgomery McFate), the daughter-in-law of Mary Lou Sapone, submitted a bill to BBI for work on behalf of Ketchum.  Her work

included: 2.5 hours visiting a "target's office"; phone calls to the target's human resources

director and media coordinator; and sending references and a resume to the target's intern

coordinator.

## DISCOVERY AND TOLLING

107.     Throughout the relevant time period, Defendants affirmatively concealed from

Plaintiff the unlawful conduct alleged herein.   These unlawful activities were by their very

nature secretive and clandestine, and Defendants went to great lengths to prevent detection of

their activities around Greenpeace's offices, employees and allies.

108.     Only when an investigative reporter for *Mother Jones* magazine discovered

Defendants' espionage and informed Plaintiff in April 2008 could Plaintiff have learned of

Defendants' misconduct.   The reporter subsequently published an article exposing Defendants'

espionage in *Mother Jones* magazine on April 11, 2008.   Immediately thereafter, Greenpeace

launched an investigation, contacting a former BBI investor on April 17, 2008 to obtain access to

his files.

109.     As a result of Defendants' concealment, any applicable statute of limitations

affecting the rights of Plaintiff has been tolled.   Plaintiff exercised due diligence to learn of its

legal rights, and, despite the exercise of due diligence, did not discover and could not have

discovered the unlawful conduct alleged herein at the time it occurred.   Plaintiff could not have

discovered, and did not discover, the unlawful conduct alleged herein until April 2008.

## FIRST CAUSE OF ACTION

### (Trespass)

110.     Plaintiff realleges each allegation in each of the paragraphs above as if fully set

forth herein.

111.    Defendants and/or their agents trespassed on the property of Plaintiff. Without permission, Defendants and/or their agents intentionally went on the Plaintiff's property, including bypassing a gated alley, to access dumpsters and recycling bins located on loading docks, sheltered bays and interior rooms used by Plaintiff. Without permission and/or under false pretenses, Defendants and/or their agents intentionally entered Plaintiff's offices.

112.    These activities were engaged in pursuant to, and in furtherance of, the conspiracies described above to secure confidential information from Greenpeace by unlawful means.

113.    Pursuant to, and in furtherance of, the common scheme, one or more Defendants committed unlawful acts and other Defendants provided financial support and direction and received the fruits of those unlawful acts.   In furtherance of the conspiracy, Defendants Ward, Bly, Mika, Ferris, and/or their agents conducted unlawful D-Lines, physical surveillance, and/or electronic surveillance that involved trespassing on the property of the Plaintiff. The individual Defendants then passed Greenpeace documents and information obtained by trespassing to their clients – Ketchum, Dow, Dezenhall and Sasol – diminishing the value of Plaintiff's intellectual property and undermining Plaintiff's environmental campaigns and organizational mission. In addition to this damage, Greenpeace subsequently incurred expenses in trying to determine the nature and scope of Defendants' intrusions and misappropriations.

114.    The Defendants also aided and abetted the unlawful activities described herein by financing those activities and participating in numerous meetings, briefings and other communications to implement and advance the conspiracy.

115.    As a direct and proximate result of Defendants' trespass, Plaintiff has suffered and is entitled to compensatory, consequential and punitive damages, in an amount to be proven

at trial.

## SECOND CAUSE OF ACTION

### (Invasion of Privacy by Intrusion)

116.    Plaintiff realleges each allegation in each of the paragraphs above as if fully set forth herein.

117.    Defendants and/or their agents intentionally invaded or interfered by physical intrusion into a place where Plaintiff had secluded itself, or into Plaintiff's private or secret concerns, in a manner that would be highly offensive to an ordinary, reasonable person. Defendants and/or their agents intentionally entered private property without permission, took Plaintiff's internal documents from dumpsters and recycling bins located on private property, conducted overzealous physical and electronic surveillance of Plaintiff's private offices and employees, examined Plaintiff's confidential financial records and internal memoranda and communications, and eavesdropped on Plaintiff's private conversations.

118.    These activities were engaged in pursuant to, and in furtherance of, the conspiracies described above to secure confidential information from Greenpeace by unlawful means.

119.    Pursuant to, and in furtherance of, the common scheme, one or more Defendants committed unlawful acts and other Defendants provided financial support and direction and received the fruits of those unlawful acts.   In furtherance of the conspiracy, Defendants Ward, Bly, Mika, Ferris, and/or their agents conducted unlawful D-Lines, physical surveillance, and/or electronic surveillance that involved intruding on the Plaintiff.  The individual Defendants then passed Greenpeace documents and information obtained by intrusion to their clients – Ketchum, Dow, Dezenhall and Sasol – diminishing the value of Plaintiff's intellectual property

- 39 -

and undermining Plaintiff's environmental campaigns and organizational mission. In addition to this damage, Greenpeace subsequently incurred expenses in trying to determine the nature and scope of Defendants' intrusions and misappropriations.

120.    The Defendants also aided and abetted the unlawful activities described herein by financing those activities and participating in numerous meetings, briefings and other communications to implement and advance the conspiracy.

121.    As a direct and proximate result of Defendants' intrusion, Plaintiff has suffered and is entitled to compensatory, consequential and punitive damages, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### (Conversion)

122.    Plaintiff realleges each allegation in each of the paragraphs above as if fully set forth herein.

123.    Defendants and/or their agents committed conversion. Defendants and their agents exercised dominion and/or control over Plaintiff's confidential documents, including campaign strategy documents, donor records, internal communications, legal memoranda, privileged attorney-client communications, financial reports and balance sheets, passwords for private electronic mailing lists, and Greenpeace credit card account numbers.

124.    Defendants and their agents also exercised dominion and/or control over Plaintiff's intellectual property, such as campaign plans and ideas, memorialized in the above referenced stolen documents. Plaintiff's intellectual property, such as campaign ideas and plans, had value by virtue of Plaintiff's exclusive possession.

125.    These activities were engaged in pursuant to, and in furtherance of, the

conspiracies described above to secure confidential information from Greenpeace by unlawful means.

126.   Defendants used the internal and confidential documents taken from Plaintiff, as well as the intellectual property contained therein, to anticipate and weaken Plaintiff's environmental campaigns and otherwise frustrate Plaintiff's organizational purpose. Knowledge of what Greenpeace intended to do, and how Greenpeace planned to allocate resources, was valuable information even when it did not relate directly to Defendants' activities, because it removed the uncertainty about whether Defendants' activities would be scrutinized, challenged or brought into the public spotlight by Greenpeace. Indeed, because this information had economic value to Defendants, Defendants funded these illegal activities, paying hundreds of thousands of dollars for hundreds of intrusions and briefings over an extended period of time.

127.   Defendants' conversion seriously interfered with Plaintiff's property interests in its documents and intellectual property and damaged Plaintiff by diminishing the value of Plaintiff's intellectual property and by undermining Plaintiff's organizational mission. In addition to this damage, Greenpeace subsequently incurred expenses in trying to determine the nature and scope of Defendants' intrusions and misappropriations.

128.   Pursuant to, and in furtherance of, the common scheme, one or more Defendants committed unlawful acts and other Defendants provided financial support and direction and received the fruits of those unlawful acts.   In furtherance of the conspiracy, Defendants Ward, Bly, Mika, Ferris and/or their agents conducted unlawful D-Lines, physical surveillance and/or electronic surveillance that involved stealing confidential documents and/or ideas and information from the Plaintiff. The individual Defendants then passed Greenpeace documents and information to their clients – Ketchum, Dow, Dezenhall and Sasol – diminishing the value of

Plaintiff's intellectual property and undermining Plaintiff's environmental campaigns and organizational mission.

129.    The Defendants also aided and abetted the unlawful activities described herein by financing those activities and participating in numerous meetings, briefings and other communications to implement and advance the conspiracy.

130.    As a direct and proximate result of Defendants' conversion, Plaintiff has suffered and is entitled to compensatory, consequential and punitive damages, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### (Trespass to Chattel)

131.    Plaintiff realleges each allegation in each of the paragraphs above as if fully set forth herein.

132.    Defendants and/or their agents committed trespass to chattel. Defendants and their agents dispossessed Plaintiff of, and/or intentionally used or intermeddled with, Plaintiff's confidential documents, including campaign strategy documents, donor records, internal communications, legal memoranda, privileged attorney-client communications, financial reports and balance sheets, passwords for private electronic mailing lists and Greenpeace credit card account numbers.

133.    These activities were engaged in pursuant to, and in furtherance of, the conspiracies described above to secure confidential information from Greenpeace by unlawful means. In furtherance of this scheme:

(a) Defendants Ward, Bly, Mika, Ferris, Dezenhall and/or Sasol unlawfully dispossessed Plaintiff of, and/or intentionally used or intermeddled with, Plaintiff's

confidential documents, including campaign strategy documents, donor records, internal communications, legal memoranda, privileged attorney-client communications, financial reports and balance sheets, passwords for private electronic mailing lists and Greenpeace credit card account numbers.

(b) Defendants Ward, Bly, Mika, Ferris, Ketchum and/or Dow unlawfully dispossessed Plaintiff of, and/or intentionally used or intermeddled with, Plaintiff's confidential documents, including campaign strategy documents, donor records, internal communications, legal memoranda, privileged attorney-client communications, financial reports and balance sheets, passwords for private electronic mailing lists and Greenpeace credit card account numbers.

134.    Defendants' trespass to chattel damaged Plaintiff by diminishing the value of Plaintiff's intellectual property and by undermining Plaintiff's mission.  Defendants used the internal and confidential documents taken from Plaintiff to anticipate or weaken Plaintiff's environmental campaigns and otherwise frustrate Plaintiff's organizational purpose.  Knowledge of what Greenpeace intended to do, and how Greenpeace planned to allocate resources, was valuable information even when it did not relate directly to Defendants' activities, because it removed the uncertainty about whether Defendants' activities would be scrutinized, challenged, and brought into the public spotlight by Greenpeace.  In addition to this damage, Greenpeace subsequently incurred expenses in trying to determine the nature and scope of Defendants' intrusions and misappropriations.

135.    Pursuant to, and in furtherance of, the common scheme, one or more Defendants committed unlawful acts and other Defendants provided financial support and direction and received the fruits of those unlawful acts.  In furtherance of the conspiracy, Defendants Ward,

Bly, Mika, Ferris and their agents conducted unlawful D-Lines, physical surveillance and/or electronic surveillance that involved trespassing to chattel of the Plaintiff. The individual Defendants then passed Greenpeace documents and information to their clients – Ketchum, Dow, Dezenhall and Sasol – diminishing the value of Plaintiff's intellectual property and undermining Plaintiff's environmental campaigns and organizational mission.

136.    The Defendants also aided and abetted the unlawful activities described herein by financing those activities and participating in numerous meetings, briefings and other communications to implement and advance the conspiracy.

137.    As a direct and proximate result of Defendants' trespass to chattel, Plaintiff has suffered and is entitled to compensatory, consequential and punitive damages, in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**(Misappropriation of Trade Secrets, D.C. Code § 36-401, *et seq.*)**

138.    Plaintiff realleges each allegation in each of the paragraphs above as if fully set forth herein.

139.    Many of the documents improperly obtained by Defendants and/or their agents from the offices of Greenpeace constitute trade secrets. The documents contain unique, internal operating information, including confidential campaign strategy, internal legal memoranda, privileged attorney-client communications, financial reports and balance sheets, passwords for private electronic mailing lists and original records related to fundraising. The documents could be and/or were used by Defendants to diminish the effectiveness of Plaintiff's environmental campaigns and frustrate its organizational purpose. Defendants took these documents because they contain economically valuable information that could not be ascertained from public

sources. Knowledge of what Greenpeace intended to do, and how Greenpeace planned to allocate resources, was valuable information even when it did not relate directly to Defendants' activities, because it removed the uncertainty about whether Defendants' activities would be scrutinized, challenged, or brought into the public spotlight by Greenpeace.

140.    Plaintiff took reasonable steps to safeguard the documents; Defendants had to trespass, deceive and steal to acquire the documents because they were closely controlled by Plaintiff.

141.    Defendants and/or their agents obtained the trade secrets from Greenpeace through improper means. They engaged in activity involving stealth, deception, trickery, trespass and theft to obtain the documents, including conducting unlawful D-Lines and infiltrating meetings.

142.    These activities were engaged in pursuant to, and in furtherance of, the conspiracies described above to secure confidential information from Greenpeace by unlawful means.

143.    Pursuant to, and in furtherance of, the common scheme, one or more Defendants committed unlawful acts and other Defendants provided financial support and direction and received the fruits of those unlawful acts.  In furtherance of the conspiracy, Defendants Ward, Bly, Mika, Ferris and their agents conducted unlawful D-Lines, physical surveillance and/or electronic surveillance that involved trespassing to chattel of the Plaintiff.  The individual Defendants then passed Greenpeace documents and information to their clients –Ketchum, Dow, Dezenhall and Sasol – diminishing the value of Plaintiff's intellectual property and undermining Plaintiff's environmental campaigns and organizational mission.

144.    The Defendants also aided and abetted the unlawful activities described herein by

financing those activities and participating in numerous meetings, briefings and other communications to implement and advance the conspiracy.

145.    As a direct and proximate result of Defendants' misappropriation of trade secrets, the Plaintiff has suffered and is entitled to compensatory, consequential and statutory damages, in an amount to be proven at trial, as well as disgorgement of any monies received by any of the Defendants as payment for such trade secrets. Greenpeace is also entitled to compensation for any expenses incurred in trying to determine the nature and scope of Defendants' intrusions and misappropriations. Defendants' misappropriation of trade secrets was willful and malicious, and as a result, Plaintiff is entitled to punitive damages and attorneys' fees.

## SIXTH CAUSE OF ACTION

### (Violations of RICO, 18 U.S.C. § 1962(c), Ward, Bly, Ferris, Mika, Ketchum and Dow)

146.    Plaintiff realleges each allegation in each of the paragraphs above as if fully set forth herein.

147.    Defendants named in this cause of action are "persons" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of an enterprise, as defined in 18 U.S.C. § 1961(4), whereby they engaged in a pattern of racketeering activity for a common illegal purpose in violation of 18 U.S.C. § 1962(c).

148.    The "enterprise" as defined in 18 U.S.C. § 1961(4) is an association-in-fact enterprise comprised of Ward, Bly, Mika and Ferris, as well as Ketchum and Dow, that was created and/or used as a tool to effectuate Defendants' pattern of racketeering activity.

149.    The association-in-fact enterprise is distinct from Defendants.

150.    The association-in-fact enterprise engaged in lawful activity that is distinct from the pattern of racketeering activity, such as collecting and sharing publicly-available information

about Plaintiff that was not derived from the misconduct described herein.

151.    The association-in-fact enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

152.    Defendants, each being associated with the enterprise, did unlawfully, knowingly, and intentionally participate, directly and indirectly, in the conduct, management, and operation of the affairs of the enterprise through a variety of actions including, *inter alia*, the following:

(a)    Defendant Ward was a Vice President, President and Managing Director of BBI;

(b)    Defendants Ward, Bly, Mika and Ferris were employees of and executives at BBI and managed the operations related to intelligence gathering for the Dow Trends Tracking Team, a group within the enterprise that emerged over the course of the enterprise's existence and organized and executed the theft and interstate transportation of Plaintiffs' property;

(c)    Defendants Ward, Bly, Mika and Ferris directed and carried out some of the central functions and operations of the enterprise, including D-Lines and electronic and physical surveillance;

(d)    Defendants Ketchum and Dow Chemical hired BBI to conduct D-Lines and electronic and physical surveillance and financed much of this activity; and

(e)    Defendants Ketchum and Dow Chemical instructed BBI on which environmental organizations to target and the types of information to unlawfully obtain.

153.    The association-in-fact was united by a common purpose, which was to gather information – through legal and illegal means – about Plaintiff in an effort to predict and preempt its campaigns and otherwise frustrate its organizational mission. Further, each member of the

enterprise was related to the others along a chain of command, with Dow and Ketchum providing financing, identifying objectives, and participating in numerous meetings, briefings and/or communications with BBI employees, who then carried out the activities described above. The enterprise developed a formal structure over time, as evidenced by the formation of the Dow Trends Tracking Team. The Team was assembled to facilitate the theft and transportation of Greenpeace's property. The enterprise existed, with little or no change in its membership, for a long period of time – over two years.

154.    Defendants, directly and/or through their agents, conducted and participated in the affairs of the enterprise through a pattern of racketeering activity consisting of indictable predicate acts under 18 U.S.C. § 1961(1), including the transportation of stolen goods in violation of 18 U.S.C. § 2314. In doing so, they violated 18 U.S.C. § 1962(c). Members of the enterprise, directly and/or through their agents, knowingly and willfully committed multiple predicate acts consisting of the transportation of stolen goods in violation of 18 U.S.C. § 2314 by transporting, transmitting, and/or transferring documents in interstate commerce after stealing them from Plaintiff. Defendants, on multiple occasions, moved these stolen goods from the District of Columbia to Maryland. These acts of transporting stolen goods in violation of 18 U.S.C. § 2314 constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1).

155.    The predicate acts of racketeering activity described above amount to a common, ongoing course of conduct resulting in the theft and distribution of confidential documents from Plaintiff. Each such racketeering activity was related, having (1) common participants; (2) the same victim; and (3) the same purpose and result of benefiting Defendants and/or their agents or co-conspirators at the expense of Plaintiff.

156.    Defendants engaged, directly and/or through their agents, in the pattern of

racketeering activity alleged herein for the purpose of conducting the affairs of the enterprise. The enterprise existed continuously for a substantial period of time. D-Lines were conducted over the course of more than two years, and regular reports were prepared and shared with Ketchum and Dow. Further, the numerous acts of theft and transportation of stolen goods that comprised the racketeering activity were related, having been part of Defendants' regular way of doing business through the enterprise.

157.    As a direct and proximate result of Defendants' conduct and participation in the conduct of the affairs of the enterprise through the said racketeering activity, Plaintiff was injured. Plaintiff's intellectual property was diminished in value, and Plaintiff's business – environmental campaigns – was interfered with. In addition, Plaintiff subsequently incurred expenses in trying to determine the nature and scope of Defendants' intrusion and misappropriations. The interference with Plaintiffs' business, in addition to the underlying predicate violations, affected interstate commerce.

158.    By virtue of these violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover treble damages, costs and attorneys' fees from Defendants and such other relief as may be appropriate, pursuant to 18 U.S.C. § 1964(c).

**SEVENTH CAUSE OF ACTION**

**(Violations of RICO, 18 U.S.C. § 1962(d),
Ward, Bly, Ferris, Mika, Ketchum and Dow)**

159.    Plaintiff realleges each allegation in each of the paragraphs above as if fully set forth herein.

160.    Each Defendant named in this cause of action knowingly furthered the efforts of the enterprise to engage in the interstate transportation of stolen goods, in violation of 18 U.S.C. § 1962(c). Each Defendant was aware of the scheme to steal information from Plaintiff, and to

then distribute that information in interstate commerce.

161.   In addition, each Defendant participated in or facilitated the scheme to trespass, steal, and distribute Plaintiffs' property, in violation of 18 U.S.C. § 2314. For instance:

(a)   Defendants Ward, Bly, Mika, and Ferris knowingly furthered the goals of the racketeering enterprise by directing and carrying out some of the central functions and operations of the enterprise, including D-Lines and electronic and physical surveillance. In doing so, they participated in the underlying racketeering activity;

(b)   Defendants Ketchum and Dow Chemical hired BBI to conduct D-Lines and electronic and physical surveillance and financed much of this activity; and

(c)   Defendants Ketchum and Dow Chemical instructed BBI on which environmental organizations to target and the types of information to unlawfully obtain. In that role, they possessed knowledge of the contours of the misconduct, and facilitated its commission.

162.   The conspiracy caused injury to Plaintiff, including, *inter alia*, the creation of an enterprise that stole its property and distributed it across interstate lines for the purpose of thwarting its advocacy efforts and organizational mission.

163.   The conduct described herein violates 18 U.S.C. § 1962(d). By virtue of these violations, Plaintiff is entitled to recover treble damages, costs and attorneys' fees from Defendants and such other relief as may be appropriate, pursuant to 18 U.S.C. § 1964(c).

## EIGHTH CAUSE OF ACTION

### (Violations of RICO, 18 U.S.C. § 1962(c), Ward, Bly, Ferris, Mika, Dezenhall and Sasol)

164.   Plaintiff realleges each allegation in each of the paragraphs above as if fully set forth herein.

165.   Defendants named in this cause of action are "persons" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of an enterprise as defined in 18 U.S.C. § 1961(4), whereby they engaged in a pattern of racketeering activity for a common illegal purpose in violation of 18 U.S.C. § 1962(c).

166.   The "enterprise" as defined in 18 U.S.C. § 1961(4) is an association-in-fact comprised of Ward, Bly, Mika and Ferris, as well Dezenhall and Sasol, that was created and/or used as a tool to effectuate a pattern of racketeering activity.

167.   The association-in-fact enterprise is distinct from Defendants.

168.   The association-in-fact enterprise engaged in lawful activity that is distinct from the pattern of racketeering activity.  For instance, the association-in-fact enterprise engaged in some legal methods of surveillance of Greenpeace activists.

169.   The enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

170.   Defendants, each being associated with the enterprise, did unlawfully, knowingly, and intentionally participate, directly and indirectly, in the conduct, management, and operation of the affairs of the enterprise through a variety of actions including, *inter alia*, the following:

(a)   Defendants Ward, Bly, Mika and Ferris directed and carried out some of the central functions and operations of the enterprise, including D-Lines and electronic and physical surveillance;

(b)   Defendants Dezenhall and Sasol requested and financed the operations of the enterprise, including D-Lines and electronic and physical surveillance conducted by the enterprise; and

(c)     Defendants Dezenhall and Sasol instructed the enterprise on the objectives of the unlawful activities – the environmental organizations they wanted to target and the types of confidential information that they wanted to obtain.

171.    The association-in-fact was united by a common purpose, which was to gather information – through legal and illegal means – about Plaintiff in an effort to predict and preempt its campaigns and otherwise frustrate its organizational purpose. Further, each member of the enterprise was related to the others along a chain of command, with Sasol and Dezenhall financing the unlawful activities and setting the objectives for BBI employees, who then carried out the activities described above. The enterprise developed a formal structure, whereby: BBI employees carried out the illegal activities; BBI employees briefed and/or communicated with Dezenhall and CONDEA Vista about their activities and shared confidential information unlawfully secured; and Dezenhall and CONDEA Vista funded the unlawful activities and set the objectives. The enterprise existed, with little or no change in its membership, for a substantial period of time – at least 16 months.

172.    Defendants, directly and/or through their agents, conducted and participated in the affairs of the enterprise through a pattern of racketeering activity that consisted of numerous indictable predicate acts under 18 U.S.C. § 1961(1) including the transportation of stolen goods, in violation of 18 U.S.C. § 2314, and wire fraud in violation of 18 U.S.C. § 1343. In doing so, they violated 18 U.S.C. § 1962(c).

(a)     Members of the enterprise, directly and/or through their agents, knowingly and willfully committed multiple predicate acts consisting of the transportation of stolen goods in violation of 18 U.S.C. § 2314 by transporting, transmitting and/or transferring documents in interstate commerce after stealing them from Plaintiff. Defendants moved

these stolen goods from the District of Columbia to Maryland. These acts of transporting stolen goods in violation of 18 U.S.C. § 2314 constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1);

(b)    BBI coordinated the infiltration of a Greenpeace ally, CLEAN, by Dick Rogers. Rogers used false pretenses to gain a seat on CLEAN's board. From that position, he monitored information related to Greenpeace. The fraudulent scheme was designed to provide more information to BBI and its paying clients, Dezenhall and Sasol, about Greenpeace's activities. Rogers forwarded confidential emails related to Greenpeace to BBI's agent, and submitted reports about Greenpeace's activity. The interstate use of email and/or telephone was a part of the essential scheme to defraud CLEAN and Greenpeace of proprietary information. These regular and repeated acts in violation of 18 U.S.C. § 1343 constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1).

173.    The predicate acts of racketeering activity described above amount to a common, ongoing course of conduct resulting in the theft and distribution of confidential documents from Plaintiffs. Each such racketeering activity was related, having (1) common participants; (2) the same victim; and (3) the same purpose and result of benefiting Defendants and/or their agents or co-conspirators at the expense of Plaintiff.

174.    Defendants, directly and/or through their agents, engaged in the pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the enterprise. D-Lines were conducted regularly over the course of at least 16 months and the fraudulent infiltration of CLEAN took place for more than a year. Therefore, the racketeering activity took place continuously for a substantial period of time. In addition, the numerous acts of interstate

transportation of stolen property and fraud were related, as both sets of racketeering activities were undertaken with the common goal of acquiring information from Greenpeace to be used by Dezenhall and Sasol in conducting their businesses.

175.   As a direct and proximate result of Defendants' conduct and participation in the conduct of the affairs of the association-in-fact enterprise through the said racketeering conspiracy, Plaintiff was injured.  Plaintiff's intellectual property was diminished in value, and Plaintiff's business – environmental campaigns – was interfered with.  In addition, Plaintiff subsequently incurred expenses in trying to determine the nature and scope of Defendants' intrusion and misappropriations.  The interference with Plaintiff's business, along with the predicate violations, had effects on interstate commerce.

176.   By virtue of these violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover treble damages, costs and attorneys' fees from Defendants and such other relief as may be appropriate, pursuant to 18 U.S.C. § 1964(c).

## NINTH CAUSE OF ACTION

### (Violations of RICO, 18 U.S.C. § 1962(d), Defendants Ward, Bly, Mika, Ferris, Dezenhall and Sasol)

177.   Plaintiff realleges each allegation in each of the paragraphs above as if fully set forth herein.

178.   Each Defendant named in this cause of action knowingly furthered the efforts of the enterprise to engage in the interstate transportation of stolen goods, in violation of 18 U.S.C. § 2314, and commit wire fraud in violation of 18 U.S.C. § 1343.  Defendants facilitated the scheme to fraudulently gain access to Greenpeace information, and have it transferred across state lines *via* email.

179.   Each Defendant participated in or facilitated the scheme to trespass, steal, and

- 54 -

distribute Plaintiff's property, in violation of 18 U.S.C. § 2314 and/or 18 U.S.C. § 1343. For instance:

      (a)    Defendants Ward, Bly, Mika and Ferris knowingly furthered the goals of the racketeering enterprise by directing and carrying out some of the central functions and operations of the enterprise, including D-Lines and electronic and physical surveillance. In doing so, they participated in the underlying racketeering activity;

      (b)    Defendant Ward supervised Mary Lou Sapone's fraudulent scheme to plant Dick Rogers inside CLEAN. He knowingly received Rogers's interstate emails forwarding confidential communications and information, and narrative reports detailing CLEAN/Greenpeace activities;

      (c)    Defendants Dezenhall and Sasol hired BBI to secure confidential information and engage in surreptitious and unlawful activities as set forth above and funded those activities; and

      (d)    Defendants Dezenhall and Sasol instructed BBI on which environmental organizations to target and the types of information to unlawfully obtain. In that role, they possessed knowledge of the contours of the misconduct, and facilitated its commission.

180.    The conspiracy caused injury to Plaintiff, including, *inter alia*, the creation of an enterprise that stole its property and participated in a fraudulent scheme to acquire confidential information. The property and information were then distributed across interstate lines for the purpose of thwarting Plaintiff's advocacy efforts and organizational mission.

181.    The conduct described herein violates 18 U.S.C. § 1962(d). By virtue of these violations, Plaintiff is entitled to recover treble damages, costs and attorneys' fees from

Defendants and such other relief as may be appropriate, pursuant to 18 U.S.C. § 1964(c).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests of this Court the following monetary and equitable relief:

A.      An injunction enjoining Defendants from committing the trespass, intrusion, conversion, trespass to chattel, misappropriation of trade secrets, and RICO violations described above;

B.      Compensatory, consequential and treble damages suffered by Plaintiff in an amount to be determined at trial, including any damages as may be provided for by statute;

C.      Disgorgement of any monies received by any Defendant as payment for the documents and information taken from Greenpeace and conveyed to another Defendant or a third-party;

D.      Punitive damages in an amount to be determined at trial, including any punitive damages as may be provided for by statute;

E.      Reasonable attorneys' fees;

F.      Costs of suit;

G.      Pre-and post-judgment interest; and

H.      Such other and further relief as this Court may deem necessary or proper.

Dated: November 29, 2010

By: _Victoria Nugent_

Kit A. Pierson (D.C. Bar No. 398123)
Victoria S. Nugent (D.C. Bar No. 470800)
George F. Farah (D.C. Bar No. 992638)
Emmy L. Levens (D.C. Bar No. 997826)
Robert A. Cacace
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

John P. Relman (D.C. Bar No. 405500)
Reed N. Colfax (D.C. Bar No. 471430)
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W.
Washington, DC  20036
Telephone:  (202) 728-1888
Facsimile:  (202) 728-0848

Attorneys for Plaintiff Greenpeace, Inc.