UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Greenpeace, Inc. ) | |
| ) | |
| Plaintiff, ) | Case No. 1:10-CV-02037-RMC |
| ) | The Hon. Rosemary M. Collyer |
| v. ) | |
| ) | |
| The Dow Chemical Company, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE
IN OPPOSITION TO DEFENDANT FERRIS'S MOTION FOR
<u>SUMMARY JUDGMENT</u>**

1. Between 1998 and 2000, Defendants conspired to and did surveil, infiltrate and steal confidential information from Greenpeace with the intention of preempting, blunting or thwarting its environmental campaigns. Complaint, ¶ 2.

2. Defendants' unlawful activities included trespassing on the property of Greenpeace, infiltrating its offices, meetings and electronic communications under false pretenses and/or by force, and by these means, stealing confidential documents, data and trade secrets from Greenpeace. *Id*.

3. The defendant chemical companies paid other members of the conspiracy, including a private security firm, Beckett Brown International, Inc.("BBI"), that employed the individual defendants, for confidential information unlawfully obtained from Greenpeace. *Id*.

4. Defendant George Ferris served as a Manager of Investigative Support for BBI. *Id*., ¶ 14.

5. As an employee of BBI, Ferris reported to Timothy Ward. *Id*., ¶14.

6. During the period 1998 through 2000, Greenpeace was involved in campaigns across the United States to expose environmental hazards and improve environmental conditions. *Id.*, ¶ 18.

7. Some of Greenpeace's campaigns targeted the practices or products of Defendants Sasol and Dow Chemical. *Id.*

8. Because of both financial and public relations concerns about the actions of Greenpeace and other environmental non-profit organizations, Defendants Sasol North America, Inc. ("Sasol," formerly CONDEA Vista Company), Dow Chemical Company ("Dow"), Dezenhall Resources Ltd. ("Dezenhall") and Ketchum Inc. ("Ketchum") – assisted by BBI, the individual Defendants and other participants in this conspiracy – engaged in an unlawful scheme to obtain confidential information and thus track and potentially disrupt or preempt Greenpeace's campaigns and activities. *Id.*, ¶ 19.

9. Much of the unlawful surveillance activity described herein was conducted for the Corporate and Public Relations Defendants' benefit by a private security firm, BBI. *Id.*, ¶ 20.

10. Beginning in or about 1998, Sasol and Dow paid BBI – either directly or by paying Defendants Dezenhall and Ketchum, which then paid BBI – hundreds of thousands of dollars for engaging in the conduct described herein. *Id.*, ¶ 21.

11. In return for these payments, Sasol and Dow received confidential information that had been misappropriated from Greenpeace through a variety of unlawful means and received numerous reports on Greenpeace's financial support, internal operations, plans and activities. *Id.*

12. BBI's accounting records show that BBI spent hundreds of hours collecting and analyzing information from Greenpeace. *Id.*, ¶ 22.

13. Records and correspondence reveal the use of surreptitious and deceitful methods of data collection, including but not limited to: pilfering documents awaiting private trash and recycling collection, placing undercover operatives within groups, using false pretenses to case offices, procuring phone records, and infiltrating meetings and electronic mail networks. *Id*.

14. These records also reveal that BBI relied upon a network of subcontractors, including off-duty police officers in Washington, D.C. and Baltimore, to carry out this work. *Id*.

15. Although it is now evident that these unlawful activities continued for years, because of their clandestine nature and actions by BBI to "sterilize" its records and destroy documents, the full scope and duration of these activities is not known. *Id*., ¶ 23.

16. Defendants acquired internal documents from their targets through actions they referred to as "D-Lines." Id., ¶ 25.

17. Defendants obtained a steady stream of inside information from Greenpeace as a result of BBI stealing confidential documents and internal records from dumpsters and recycling bins located at Greenpeace's offices. *Id*.

18. Upon information and belief, D-lines also included the acquisition of documents stolen from Greenpeace's offices or obtained by BBI's employees and/or subcontractors who obtained access to Greenpeace's documents through false pretenses. *Id*.

19. Defendants Ward, Bly, Mika and Ferris personally directed and/or conducted D-Lines at Greenpeace's offices in Washington, D.C. *Id*., ¶ 26.

20. Defendants Ward, Bly, Mike and Ferris hired subcontractors, including a police officer for the District of Columbia, James Daron, to assist with the collection of the materials at Greenpeace's offices in the District of Columbia. *Id*.

21. Daron was expected to use his official police badge to gain access to dumpsters that were enclosed by a locked fence. *Id*.

22. Between July 13, 1998 and July 18, 2000, Defendants Ward, Bly, Mika and Ferris, or their agents, conducted more than 120 documented D-Lines at Greenpeace's offices. *Id*.

23. Defendants Ward, Bly, Mika and Ferris, or their agents, used Daron in connection with at least 55 of those D-Lines. *Id*.

24. Each D-Line conducted at Greenpeace involved trespassing on private property and stealing documents where Greenpeace had a reasonable expectation of privacy. *Id*. ¶ 27.

25. The scope and nature of these activities – which involved systematic and clandestine efforts to steal records, often with the help of "off-duty" law enforcement officials, without regard to whether they were on private property, behind locked fences, in locked or closed containers or otherwise guarded from public exposure well over a hundred times over at least a two year period – shows utter disregard for Greenpeace's privacy and property interests. *Id*.

26. The Defendants' conduct reflected their understanding that these documents would never have been shared with them, and could only be obtained by clandestine means executed under the cover of darkness. *Id*.

27. Between 1998 and May 2000, Greenpeace was located at 1436 U Street, NW, Washington, D.C. *Id*., ¶ 28.

28. The building's entrances were locked at all times. Greenpeace's recycling bins and trash dumpsters were located on private property. *Id*.

29. The recycling bins, which were covered, were located on an elevated loading dock sheltered inside the black façade of the building. *Id.*

30. The trash dumpster, which was covered, abutted the building at ground level. *Id.*

31. Greenpeace had access to the recycling bins and the trash dumpsters at any time. *Id.*

32. Greenpeace did not use municipal garbage collection services. *Id.*

33. Greenpeace's recycling and trash were handled by private contractors licensed by the District. *Id.*

34. Between 1998 and 2000, Ward, Bly, Mika and Ferris, or their agents, conducted more than 100 D-Lines at Greenpeace's U Street office, and police officer Daron participated in at least 55 of them. *Id.*

35. The overwhelming majority of these intrusions were conducted on behalf of Defendants Dow, Sasol (i.e., its predecessor CONDEA Vista), Ketchum and/or Dezenhall. *Id.*

36. The "U Street Project Objectives" explicitly included obtaining financial information about Greenpeace: "funding"; "[d]onors: corporate political, private"; and "money trails." *Id.*

37. Greenpeace has recovered more than one thousand pages of its own internal documents from BBI's files. *Id.*, ¶ 30.

38. On information and belief, this represents only a fraction of what was taken. *Id.*

39. The vast majority of Greenpeace's internal documents that were ultimately recovered from BBI were in pristine condition, giving rise to the inference that these documents were not taken from trash dumpsters, but rather from recycling receptacles and/or from inside Greenpeace's office. *Id.*, ¶ 31.

40. Upon information and belief, under the direction of Ward, BBI employees or contractors acted in furtherance of conspiracies described herein by breaking into Greenpeace's U Street offices using the three- and four-digit security codes that unlock office doors. *Id*., ¶ 35.

41. BBI employees or contractors tested multiple three- and four-digit codes and documented whether each code was successful in granting access to the offices. *Id*.

42. Upon information and belief, Bly, Mika and Ferris, or their agents, engaged in electronic surveillance of Greenpeace, including the wiretapping of phones and hacking into computers. *Id*. ¶ 36.

43. Among the Greenpeace internal documents and research files maintained at BBI's offices was a file labeled "Wire Tap Info." *Id*., ¶ 37.

44. A former BBI employee, Eric Pikus, has testified that during the course of his work at BBI, he would tape-record telephone conversations. *Id*., ¶ 38.

45. BBI hired TriWest Investigations to procure the phone call records of Greenpeace employees or contractors. *Id*.¶ 39.

46. BBI obtained the records of cellular phone calls placed and received by Greenpeace employees or contractors from Greenpeace's cellular phone provider. *Id*., ¶ 40.

47. As a result of Ward, Bly, Mika and Ferris, or their agents, ordering and conducting unlawful D-Lines, physical intrusions and electronic surveillance, Defendants obtained a variety of confidential, internal, Greenpeace documents, including: campaign planning documents; confidential donor letters and records of contributions; internal communications; confidential legal memoranda; privileged attorney-client communications; financial reports, balance sheets and budgets; passwords for private electronic mailing lists; Greenpeace credit card account numbers; and highly-sensitive personal information about

Greenpeace employees such as Social Security Numbers, personal bank account statements and employment agreements. *Id.*, ¶ 46.

48.     Many of these documents were tightly guarded within Greenpeace and would only have been accessible to a limited number of employees; such documents would not have been discarded as garbage or recycling in the ordinary course of business and could not have been obtained merely by rummaging through bins. *Id.*

49.     As a result of Ward, Bly, Mia and Ferris, or their agents, ordering and conducting unlawful D-Lines and, on information and belief, physical intrusions, Defendants obtained a variety of confidential, internal documents from Greenpeace ally Fenton Communications, including: billable time summary reports, reflecting the work performed for Fenton clients; internal fee memoranda, which provide instructions of invoicing particular clients; draft invoices for clients; time slip reports, which document the billable hours of each employee; and a check for the reimbursement of a health insurance claim for David Fenton, which was mailed to his home address. *Id.*, ¶ 49.

50.     Dow, CONDEA Vista, Ketchum and/or Dezenhall paid for the vast majority of D-Lines and physical and electronic surveillance and intrusions of Greenpeace that BBI conducted. *Id.*, ¶ 50.

51.     From 1998 through 2000, Ward regularly briefed Andy Shea of Dezenhall, Tom Donnelly of Ketchum and Peter Markey of CONDEA Vista about the information unlawfully obtained from Greenpeace. *Id.*, ¶ 51.

52.     On occasion, Mike, Bly, Ferris and another employee, Sarah Slenker, assisted Ward with the briefings. *Id.*

53. In addition to in-person briefings, BBI produced written reports, which began with the advisory, "The following information was supplied by confidential sources and should be used with great discretion." *Id.*

54. Between 1984 and 2001, CONDEA Vista (now Sasol) operated a vinyl chloride manufacturing facility in Lake Charles, Louisiana. *Id.*, ¶ 56.

55. The manufacture of vinyl chloride released dioxins and other toxic chemicals directly into the environment or indirectly through incinerator emissions, causing environmental damage and raising health concerns in the region. *Id.*

56. During the period that CONDEA Vista hired BBI to monitor Greenpeace's activities, Greenpeace was campaigning to expose the hazards of vinyl chloride production and the environmental damages caused by CONDEA Vista in the Lake Charles region of Louisiana. *Id.*, ¶ 57.

57. CONDEA Vista engaged Dezenhall for help in securing confidential information about environmental campaigns affecting its plant in Louisiana. *Id.*, ¶ 58.

58. On May 26, 1998, working at the behest of both CONDEA Vista and Dezenhall, BBI initiated the "Lake Charles Project" to secure confidential information about environmental organizations and campaigners, including Greenpeace and its employees for CONDEA Vista. *Id.*, ¶ 59.

59. Peter Markey an executive who reported directly to the president of CONDEA Vista during the relevant time period, has testified under oath that he hired BBI to "infiltrate activist groups" that were drawing attention to the environmental hazards created by CONDEA Vista's manufacturing activities in Louisiana and that he instructed BBI to "find out what you can find out." *Id.*, ¶ 60.

60. In seeing BBI, he was aware of its "surveillance experience" and that it was a "surveillance operation." *Id.*

61. Between July 13, 1998 and November 12, 1998, Ward, Mika and Ferris and/or their agents conducted at least 35 D-lines at Greenpeace's offices for the Lake Charles Project, collaborating on the pick-up, review and client briefings. *Id.*, ¶ 65.

62. Nichols-Dezenhall approached BBI as early as 1996 proposing a "joint venture" in which Nichols-Dezenhall and BBI would gather and "exploit" intelligence for corporate clients. *Id.*, ¶ 102.

63. The proposed target (i.e., buyer) for these services was "risk-oriented, top-level managers who either view decisive action as a necessary last resort or, preferably, as a prophylactic course of action." *Id.*

64. Shortly after beginning surveillance work for BBI, Ferris advised BBI investigators to obtain false IDs from a source recommended by him to purchase equipment that could generate photo credentials and work order forms, and to procure "generic work uniforms" to assist in visits to the offices of targets. *Id.*, ¶ 103.

Dated: March 25, 2011                               By:            /s/ Victoria S. Nugent
                                                              Victoria S. Nugent (D.C. Bar No. 470800)
Kit A. Pierson (D.C. Bar No. 398123)
George F. Farah (D.C. Bar No. 992638)
Emmy L. Levens (D.C. Bar No. 997826)
Robert Cacace (D.C. Bar No. 999006)
COHEN, MILSTEIN, SELLERS & TOLL P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:   (202) 408-4600
Facsimile:    (202) 408-4699

John P. Relman
Reed N. Colfax
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W.
Washington, DC  20036

Telephone:  (202) 728-1888
Facsimile:   (202) 728-0848

*Attorneys for Plaintiff Greenpeace, Inc.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Plaintiff's Statement of Material Facts in Dispute in Opposition to Defendant Ferris's Motion for Summary Judgment was served on counsel of record who have appeared in this action through the electronic filing system for the U.S. District Court for District of Columbia on March 25, 2011.

/s/ Victoria S. Nugent