UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GREENPEACE, INC., | ) ) ) ) ) | |
| Plaintiff, | ) ) ) ) | |
| v. | ) ) ) ) ) | Civil Action No. 10-2037 (RMC) |
| THE DOW CHEMICAL COMPANY, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

Greenpeace, Inc. ("Greenpeace") accuses targets of its environmental campaigns and others of civil racketeering in connection with alleged corporate espionage intended to interfere with those campaigns. However, Greenpeace's Complaint fails to establish a direct connection between the alleged federal criminal acts and any injury Greenpeace might have suffered. The racketeering counts will be dismissed for failure to state a claim. The Court declines to exercise supplemental jurisdiction over the remaining claims, which are all cognizable under state law. Accordingly, the Complaint will be dismissed.

**I. Facts**

Greenpeace brings its Complaint against The Dow Chemical Company ("Dow"), Sasol North America, Inc. ("Sasol"), Ketchum, Inc. ("Ketchum"), Dezenhall Resources, Ltd.

1

("Dezenhall") (collectively the "Corporate Defendants"); and Timothy Ward, Jay Arthur Bly, Michael Mika, and George Ferris (collectively the "Individual Defendants") for compensatory, statutory, and punitive damages.

Greenpeace is a nonprofit corporation headquartered in Washington, D.C. and incorporated under the laws of California. Founded in 1971, Greenpeace is one of the oldest and largest environmental organizations in the world. It campaigns to protect the oceans and ancient forests and to end toxic pollution, global warming, nuclear hazards, and genetic engineering. Compl. ¶ 7 [Dkt. #1].

Dow sells chemical, plastic, and agricultural products and services. *Id*. ¶ 8. As relevant here, Sasol (then CONDEA Vista)[1] made ethylene dicloride and vinyl chloride at a manufacturing facility in Lake Charles, Louisiana. *Id*. ¶ 9. Ketchum and Dezenhall (then Nichols-Dezenhall)[2] are public relations firms that were hired by Dow and Sasol, respectively, to aid in securing information regarding environmental campaigns affecting the companies' businesses. *Id*. ¶¶ 58, 95. The Individual Defendants were all managers for Becket Brown International, Inc. ("BBI"), a now-defunct private security firm allegedly composed of former officers of the Secret Service and Central Intelligence Agency. *Id*. ¶¶ 12-15, 20. Greenpeace alleges that the Corporate

---

[1] *See* Compl. ¶ 9 ("Sasol North America, Inc., is a for-profit producer of commodity and specialty chemicals incorporated in Delaware and headquartered in Houston, Texas. The company was founded in 1984 under the name CONDEA Vista Company. In 1991, it became a wholly-owned subsidiary of RWE-DEA AG, a German oil and gas producer. On March 1, 2001, Sasol Ltd. purchased CONDEA Vista Company from RWE-DEA AG and CONDEA Vista changed its name to Sasol North America, Inc., a subsidiary of Sasol Ltd."). During the time periods relevant to the Complaint the entity was CONDEA Vista Company ("CONDEA Vista").

[2] Dezenhall was known as Nichols-Dezenhall until 2004 when co-founder David Nichols left the firm. Compl. ¶ 11.

2

Defendants hired BBI to obtain confidential information from Greenpeace through various unlawful means. *Id.* ¶ 21.

Greenpeace alleges that, between 1998 and 2000, all Defendants conspired to and did surveil, infiltrate, and steal confidential information from Greenpeace with the intention of preempting, blunting, or otherwise thwarting its environmental campaigns. It also alleges that BBI, Sasol, Dezenhall, and the Individual Defendants fraudulently infiltrated an environmental group that was an ally of Greenpeace, the Calcasieu League for Environmental Action Now ("CLEAN"), and used email to forward, *i.e.*, "wire," information about Greenpeace to BBI and, ultimately, Dezenhall and Sasol. *Id.* ¶¶ 33, 172(b).

During the relevant period, Greenpeace was involved in campaigns that targeted the practices or products of Sasol and Dow, specifically Sasol's vinyl chloride production, which allegedly emitted toxic chemicals into the Lake Charles region of Louisiana, and Dow's manufacturing activities, which create dioxin, as well as its products containing genetically modified organisms. *Id.* ¶ 18. In its efforts in Louisiana, Greenpeace was allied with CLEAN. *Id.* ¶ 33. In response to Greenpeace's campaigns, the Corporate Defendants retained BBI to gather and collect information regarding Greenpeace in surreptitious and allegedly illegal ways. The Complaint identifies two different conspiracies involving BBI and the Individual Defendants to secure confidential information from Greenpeace, the first involving Sasol and Denzenhall and the second involving Dow and Ketchum. *Id.* ¶ 55. Greenpeace became aware of these activities through a 2008 article in *Mother Jones* that used information made available by a former BBI principal to expose the Defendants' alleged illegal activities. *Id.* ¶¶ 24, 108.

According to the Complaint, BBI identified Greenpeace as a "target" and, in a 1998

memorandum, described its efforts to monitor "environmental activist groups,"[3] through which it was able to provide "insight into the scheduling of environmental protests and actions of the group, corporate targets, the tracking of maritime cargo by the group, and internal political issues of the group." *Id.* ¶ 22. As part of its monitoring activity, BBI is alleged to have broken into Greenpeace's offices, stolen its confidential documents, and engaged in physical and electronic surveillance of Greenpeace and its ally organizations. The Corporate Defendants allegedly paid for these activities. *Id*. ¶ 50. For example, between October 1998 and July 1999, Dezenhall paid BBI approximately $150,000 to work on the "U Street Project," which provided information to Sasol. *Id.* ¶¶ 52-53. The objective of this project was to gather information from Greenpeace "about the organization's campaigns against the manufacture and sale of plastics containing polyvinyl chloride; its donors and funding sources; its connections with the United States Attorney General and other regulators in federal government; and its political support." *Id*. ¶ 52. In addition, it is alleged that Sasol paid BBI directly for the "Lake Charles Project," through which BBI monitored environmental campaigns affecting Sasol's plant in Louisiana. *Id.* ¶ 64. Likewise, between October 1998 and January 2001, Ketchum paid BBI more than $125,000 to obtain confidential information from Greenpeace for Dow. *Id.* ¶ 95.

Defendants allegedly used various tactics in order to gain Greenpeace's confidential information. In particular, BBI allegedly obtained documents and records from dumpsters[4] and

---

[3] The Complaint alleges that the Center for Food Safety, Friends of the Earth, GE Food Alert, Fenton Communications, the National Environmental Trust and the Institute for Agriculture & Trade Policy were also investigated. Compl. ¶ 23.

[4] It is alleged that Metropolitan Police Officer James Daron was retained by BBI as a subcontractor to use his official police badge to gain access to the dumpsters that were enclosed and secured behind a locked fence. Compl. ¶ 26.

recycling bins at Greenpeace's offices and also acquired documents through false pretenses, a practice defined by Greenpeace as "D-lines."[5]  *Id*. ¶ 25.  Each instance of purloining Greenpeace's internal, confidential documents allegedly "involved trespassing on private property and stealing documents where Greenpeace had a reasonable expectation of privacy." *Id.* ¶ 27.  Such incursions occurred "well over a hundred times over at least a two year period." *Id.* (emphasis omitted).  The Individual Defendants are alleged to have "personally directed and/or conducted [such activities] at Greenpeace's offices in Washington, D.C." *Id.* ¶ 26.  Defendants, directly and/or through their agents, moved documents stolen through these activities from the District of Columbia to Maryland.[6]  *Id.* ¶ 154.

The Individual Defendants and/or their agents are also alleged to have employed extensive physical surveillance, infiltration, and intrusion to obtain information from and about Greenpeace on behalf of the conspirators, such as:  1) sending a spy to pretend to apply for a position as a Greenpeace volunteer who used the opportunity to tour its premises and gather information; 2) hiring an individual to infiltrate Greenpeace's ally in Louisiana, CLEAN, who eventually became a CLEAN board member and used his position to forward confidential information to BBI; and 3) breaking into Greenpeace's U Street offices and obtaining highly confidential personnel, financial and employment records.  *Id*. ¶¶ 33-35.  The Complaint also states that Individual Defendants Bly, Mika, Ferris, and/or their agents engaged in unspecified amounts of electronic surveillance, including

---

[5] The Complaint alleges that the pristine condition of internal Greenpeace documents recovered from BBI's files strongly suggests that they were obtained by outright theft from Greenpeace's offices and not just from trash or recycling bins.  Compl. ¶ 31.

[6] The Complaint does not directly address this, but it seems that BBI's offices were located in Maryland.

wiretapping and computer hacking on behalf of the conspirators. *Id.* ¶ 36. In addition, BBI allegedly obtained records of calls made to and from cell phones leased by Greenpeace for use in Louisiana. *Id.* ¶ 69. As a result of these activities, BBI is alleged to have obtained a variety of confidential, internal Greenpeace documents, including:

> campaign planning documents; confidential donor letters and records of contributions; internal communications; confidential legal memoranda; privileged attorney-client communications; financial reports, balance sheets and budgets; passwords for private electronic mailing lists; Greenpeace credit card account numbers; and highly-sensitive personal information about Greenpeace employees such as Social Security Numbers, personal bank account statements and employment agreements.

*Id.* ¶ 46. Allegedly, the confidential information obtained by BBI was generally shared with Sasol and Dow through Dezenhall and Ketchum. *Id.* ¶ 53.

Greenpeace filed suit on November 29, 2010, after it was alerted of these activities through the 2008 *Mother Jones* article.[7] Against all Defendants, it brings common law or state statutory claims for trespass, invasion of privacy by intrusion, conversion, trespass to chattel, and misappropriation of trade secrets under the District of Columbia Uniform Trade Secrets Act, D.C. Code § 36-401. It also brings federal claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) (conducting an enterprise through a pattern of racketeering activity) and § 1962(d) (conspiracy to violate RICO). The alleged racketeering activities that form the basis for Defendants' RICO violations consist of transmission of stolen goods in interstate commerce, in violation of 18 U.S.C. § 2314 (against all Defendants), and wire fraud, in violation of 18 U.S.C. § 1343 (against Sasol, Dezenhall, and Individual Defendants). The

---

[7] Because Greenpeace had no knowledge of the alleged corporate espionage, the instant Complaint is timely and Defendants' arguments to the contrary are rejected.

Complaint also alleges two different conspiracies to violate RICO, one involving Dow, Ketchum, and the Individual Defendants and the other involving Sasol, Dezenhall, and the Individual Defendants.

Specifically, the Complaint alleges a pattern of racketeering activity composed of "multiple predicate acts consisting of the transportation of stolen goods in violation of 18 U.S.C. § 2314 by transporting, transmitting, and/or transferring documents in interstate commerce after stealing them from Plaintiff." Compl. ¶ 154. "As a direct and proximate result" of these acts, Greenpeace's "intellectual property was diminished in value, and Plaintiff's business – environmental campaigns – was interfered with. In addition, Plaintiff subsequently incurred expenses in trying to determine the nature and scope of Defendants' intrusion and misappropriations." Id. ¶ 157. Additionally, through their agents, BBI, Sasol, and Dezenhall are alleged to have infiltrated CLEAN and used email to defraud Greenpeace of proprietary information in violation of the wire fraud statute, 18 U.S.C. § 1343.[8] Compl. ¶ 172(b). The same damages, diminution of intellectual property value, business interference, and subsequent costly investigation, are alleged as result of this activity. Id. ¶ 175.

All Defendants move to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In addition, Dow, Sasol, and the Individual Defendants move for dismissal under Federal Rule of Civil Procedure 12(b)(1). Mr. Ferris also moves for summary judgment, claiming that he was only employed by BBI for one month of the time period during which the Defendants undertook the activities alleged in the Complaint.

---

[8] The Complaint also vaguely alleges that telephones were used to perpetrate this fraud, but does not allege any specific instances of or manner in which telephones were utilized.

## II. Legal Standard

### A. Motion to Dismiss

A motion to dismiss pursuant to Rule 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. FED. R. CIV. P. 12(b)(6). Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id*. 8(a)(2). A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. The facts alleged "must be enough to raise a right to relief above the speculative level." *Id*. Rule 8(a) requires an actual showing and not just a blanket assertion of a right to relief. *Id.* at 556 n.3. "[A] complaint needs *some* information about the circumstances giving rise to the claims." *Aktieselskabet Af 21. Nov. 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 17 n.4 (D.C. Cir. 2008).

A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. However, a court need not accept as true legal conclusions set forth in a complaint. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 1950.

In order to survive a motion to dismiss, a complaint must contain sufficient factual

matter to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949. When a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *Id*.

### B.  Civil RICO

A RICO violation under § 1962(c) consists of four elements:  (1) conducting (2) an enterprise (3) through a pattern (4) of racketeering activity. *Western Assocs. Ltd. Pshp. v. Market Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001); *See* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity..."). "Racketeering activity" requires the commission of specified predicate criminal acts that are defined by statute. *Market Square*, 235 F.3d at 633. RICO requires at least two overt acts of racketeering activity in order to establish a pattern. 18 U.S.C. § 1961(5). Further, these acts must be related and must "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989). It is also a violation of the RICO statute to conspire to violate any subsection of 18 U.S.C. § 1962. *See* 18 U.S.C. § 1962(d)

> RICO specifically allows civil enforcement:
>
> [A]ny person injured in his business or property *by reason of* a violation of section 1962 of this chapter [18] may sue therefor in any appropriate United States district court and shall recover three fold the damages he sustains and the cost of the suit, including a reasonable attorney's fee....

18 U.S.C. § 1964(c) (emphasis added).  To maintain standing to sue for a violation of § 1962(c), a plaintiff must allege that (1) he suffered an injury to his business or property and that (2) defendant's RICO predicate acts were the cause of the injury.  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495-97 (1985) (stating that plaintiff only has standing to the extent that he has been injured "by the conduct constituting the [RICO] violation").

In order to state a claim under civil RICO, injured parties must show that the RICO predicate offense was not only the "but for" cause of their injury, but the proximate cause as well. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992); *Hemi Grp., LLC v. City of New York,* 130 S. Ct. 983, 989 (2010).  Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268.  "A link that is too remote, purely contingent, or indirect is insufficient." *Hemi Grp.*, 130 S. Ct. at 989 (internal citations omitted).

### III. Analysis

The Complaint fails to establish that Defendants' RICO predicate acts were the proximate cause of Greenpeace's injuries.  In this case, the injuries that allegedly stem from Defendants' interstate transportation of stolen goods in fact stem from underlying violations of District of Columbia law that do not constitute racketeering activity for the purposes of § 1962(c). *See* 18 U.S.C § 1961(1) (listing criminal acts that constitute racketeering activity).  Greenpeace's RICO claim that is based upon violations of the wire fraud statute also suffers from causation issues.  The direct victim of this alleged wire fraud was not Greenpeace, but a third party, and, therefore, the link between Greenpeace's injuries and Defendants' alleged racketeering activity is too attenuated

to be actionable under RICO. Greenpeace's injuries in both scenarios stand at too remote a distance from the RICO predicate acts for it to recover.

### A. Counts Six and Eight (Interstate Transportation of Stolen Goods)

Greenpeace alleges that BBI, as agent of the Corporate Defendants, illicitly obtained Greenpeace's confidential documents and transported them across state lines. Compl. ¶ 154. As a result, in Counts Six and Eight of the Complaint, Greenpeace claims that all Defendants violated 18 U.S.C. § 2314, which criminalizes the transportation, transmission, or transfer "in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud."[9] 18 U.S.C. § 2314. These acts form the basis of Greenpeace's claim that Defendants engaged in a pattern of racketeering activity in violation of § 1962(c). Compl. ¶¶ 154, 172.

Greenpeace describes three injuries arising from Defendants' alleged activities: reduction in the value of its intellectual property, interference with its business of environmental campaigns, and costs of investigation. *Id.* ¶¶ 157, 175. It states: "Greenpeace's confidential documents – including work-product relating to its advocacy, legal memoranda, financial records and reports, and personal employee information – were stolen." Pl.'s Opp'n to Mots. to Dismiss by Defs. Sasol, Denzenhall and Individual Defendants at 17 [Dkt. # 69] ("Pl.'s Opp'n").[10] These

---

[9] The term "interstate commerce" includes commerce between one state, territory, possession, or the District of Columbia and another state, territory, possession, or the District of Columbia. 18 U.S.C. § 10.

[10] It is alleged that these materials were entirely or predominately purloined from trash containers located in a secure area at the rear of the buildings in which Greenpeace located its office, to which BBI investigators gained access by paying an off-duty police officer performing security functions. Compl. ¶ 26-27. The parties dispute whether Greenpeace had a continued ownership and expectation of privacy in discarded documents; the Court need not resolve this question given the resolution of the motion on other bases.

documents were transported between the District of Columbia and Maryland on multiple occasions. Compl. ¶¶ 154, 172. Greenpeace argues that its "ability to control the timing and release of its announcements, reports, and actions is a form of currency; the loss of its ability to control the release of its own intellectual property diminishes its value." Pl.'s Opp'n at 18. Greenpeace's own arguments demonstrate the locus of the harm alleged in Counts Six and Eight: theft and loss of confidentiality, but *not* the transport of stolen materials across state lines. While stealing the documents and disseminating their contents might be proximate to the claimed injuries, the actual transportation of the documents to Maryland did not affect Greenpeace's alleged injuries. It is happenstance that BBI committed its alleged thefts in the District of Columbia and transported stolen documents to its offices in Maryland; the same ills would have befallen Greenpeace had BBI been officed in the District.

A RICO violation requires a direct connection between the predicate criminal act and the injury. *Hemi Grp.*, 130 S. Ct. at 989; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."). To maintain its RICO cause of action, Greenpeace must directly tie its injuries to the movement of its documents across state lines, *i.e.*, from the District to Maryland. But, as Greenpeace admits, "[t]he diminished value of [its] property was a direct result of its theft and dissemination to a wide audience," Pl.'s Opp'n at 20, not its interstate transportation.

Greenpeace's argument that Defendants' RICO violations were "theft and interstate transportation of property," Pl.'s Opp'n at 20, is inaccurate. "Theft" is a violation of the District of Columbia's criminal law, *see, e.g.*, D.C. Code § 22-3211, and is not a predicate criminal act for the

purposes of RICO.  *See* 18 U.S.C § 1961(1).  Transportation of stolen goods across state lines, 18 U.S.C. § 2314, constitutes the relevant criminal act for RICO purposes, not the initial thievery.

Greenpeace resists this conclusion.  It argues that "there are no intervening steps between Defendants' misconduct and the injuries alleged," and that "[t]he theft of Greenpeace's property, and attendant reduction in its value, was a direct result of the D-Lines, infiltration, and surveillance perpetrated against it."  Pl.'s Opp'n at 21.  Assuming that each of these allegations is true, as the Court must when considering a motion to dismiss, *Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993), they continue to revolve around "theft" of goods and intelligence and *not* the alleged offense of interstate transportation of stolen goods.

Greenpeace recognizes that "the compensable injury necessarily is the harm caused by the predicate acts."  Pl.'s Opp'n to Mots. to Dismiss by Defs. Dow, Ketchum, and Individual Defendants at 21 [Dkt. # 66] (quoting *Sedima*, 473 U.S. at 480 (1975)).  However, it fails to make any connection between its alleged injuries and the predicate act of interstate transportation of stolen goods – much less a direct link.  Since neither theft nor dissemination of stolen material makes out a predicate act on which a RICO violation may be based, the RICO allegations in Counts Six and Eight based on such actions fail to state claim.

It appears Greenpeace believes that because federal law makes it a crime to transport stolen goods across state lines, it can federalize the theft itself without regard to interstate transportation.  Not so.  Such an analysis offends the principles of federal-state relations; RICO was not intended to federalize offenses against state law where its requirements are not met.  *See HMK Corp. v. Walsey*, 828 F.2d 1071, 1076 (4th Cir. 1987) (explaining that to permit plaintiffs that are

not victims of a pattern of racketeering within the meaning RICO to bring federal claims "would deprive states of jurisdiction over local controversies in a way Congress never intended"); *Gross v. Waywell*, 628 F. Supp. 2d 475, 482 (S.D.N.Y. 2009) (noting that an exercise of federal court jurisdiction in cases that fall short of RICO's substantive threshold implicates questions of federalism and would threaten to "federalize garden-variety state common law claims"). A theft committed in the District of Columbia violates the tranquility of its own citizens, not necessarily that of the citizens of neighboring states. When, however, a thief transports his booty from one state to another to sell there, neither state can fully prosecute because parts of the crime occurred in different jurisdictions. *See United States v. Sheridan*, 329 U.S. 379, 385 (1946) (explaining that in criminalizing interstate transportation of stolen goods Congress "contemplated coming to the aid of the states in detecting and punishing criminals whose offenses are complete under state law, but who utilize the channels of interstate commerce to make a successful getaway and thus make the state's detecting and punitive processes impotent"). Federal law addresses this issue, but it does not change the specific nature of the federal crime: knowingly transporting stolen goods across state lines. It is the knowing transportation of stolen goods, not the theft itself, that is a federal crime.

Even if Greenpeace were able to establish a link between its injuries and the interstate transportation of its confidential documents, its claim would still suffer because it fails to plead that Defendants engaged in the interstate transportation of stolen goods worth at least $5,000, as required by 18 U.S.C. § 2314.[11] Greenpeace makes general claims in its Complaint that the Defendants paid BBI over $100,000 for information pertinent to Greenpeace. *See* Compl. ¶¶ 52, 95. It argues that

---

[11] Given its disposition of the Complaint, the Court does not address arguments that the intellectual property and documents assertedly stolen from Greenpeace do not constitute "goods, wares, merchandise, securities or money" as required by 18 U.S.C. § 2314.

these allegations show the value of the goods transported to Maryland because they prove the documents' worth in the thieves' market. Pl. Opp'n at 29-30. However, these payments were for the alleged package of services provided by BBI to the Corporate Defendants that included intrusions, surveillance, and briefings for the benefit of all Defendants. *See* Compl. ¶ 100 ("Ketchum paid BBI more than $125,000 for engaging in unlawful activities."), ¶ 126 (Defendants paid for "hundreds of intrusions and briefings over an extended period of time."). Payment for BBI's services overall does not support an inference that the documents transported on any one occasion by BBI were worth at least $5,000, let alone that BBI transported documents of that value on at least two occasions as required by RICO. *See* 18 U.S.C. § 1961(5).

### B. Count Eight (Wire Fraud)

In addition to violations of § 2314, Greenpeace also relies on alleged acts of wire fraud in violations of 18 U.S.C. § 1343 as predicate acts to support its RICO claims against Sasol, Dezenhall, and the Individual Defendants. Greenpeace states that a BBI agent, Dick Rogers, used "false pretenses" to gain a seat on the board of Greenpeace's ally, CLEAN, in order to monitor information related to Greenpeace. *See* Compl. ¶ 172(b). It seems that Greenpeace worked with CLEAN in its campaign to expose the hazards of defendant Sasol's (then CONDEA Vista) vinyl chloride manufacturing in Lake Charles, Louisiana. *See id*. ¶¶ 56-70. From his position on the board, Mr. Rogers "forwarded confidential e-mails related to Greenpeace to BBI agents," and Greenpeace alleges that the "interstate use of email and/or telephone was a part of the essential scheme to defraud CLEAN and Greenpeace of proprietary information." *Id*. ¶ 172(b). Greenpeace does not allege that its own confidential information or communications were forwarded, rather, it states that e-mails from CLEAN's e-mail system were forwarded by Mr. Rogers. Greenpeace alleges

that, as a result of this conduct, it suffered a reduction in the value of its intellectual property, interference with its business of environmental campaigns, and the costs of investigation. *Id*. ¶ 175.

Here, too, Greenpeace faces an insurmountable hurdle arising from the requirement of proximate cause because the direct victim of Defendants' alleged actions was a third party. Greenpeace stands at a distance from the criminal activity in question and fails to allege a direct link between the injury asserted and the alleged predicate acts as the Supreme Court instructs. *See Holmes*, 503 U.S. at 269-70.

> Although directness of relationship is not the sole requirement of [RICO] causation, it is one of its central elements for a variety of reasons. First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely. . . . [T]hese reasons apply with equal force to suits under § 1964(c) [as to the Clayton Act].

*Id.* (internal citations omitted). Therefore, "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said [at common law] to stand at too remote a distance to recover." *Id.* at 268-69. This precise analysis was adopted and applied in *Holmes* to civil RICO claims. *Id.* at 270.

The Supreme Court in *Anza* further demonstrated the need for a direct link between

16

a RICO predicate act and an injury and highlighted why RICO plaintiffs generally cannot recover for harm that befalls third parties. In *Anza*, Ideal Steel complained that National Steel, owned by Mr. and Mrs. Anza, failed to charge required New York State sales tax and thereby was able to lower its prices without harm to its bottom line, but with resulting harm to Ideal Steel's competing business. *Anza*, 547 U.S. at 454-55. "The RICO violation alleged by Ideal [was] that the Anzas conducted National's affairs through a pattern of mail fraud and wire fraud. The direct victim of this conduct was the State of New York, not Ideal. It was the State that was being defrauded and the State that lost tax revenue as a result." *Id.* at 458. The Court concluded that proximate cause was lacking because Ideal's harm from National's lower prices was "entirely distinct from the alleged RICO violation (defrauding the State)." *Id*. It noted that one of the premises of the directness requirement is the "difficulty that can arise when a court attempts to ascertain the damages caused by some remote action." *Id*. Indeed, as the Court noted, National's lower prices could have been occasioned by numerous causes apart from its tax holiday; Ideal's loss of sales could have been prompted by a host of reasons other than National's tax gamesmanship; and attempting to quantify any losses experienced by Ideal would be completely speculative. *Id.* at 458-59.

Greenpeace complains that defendants Sasol, Dezenhall, and the Individual Defendants violated RICO through "wire fraud." The relevant statute states:

> Whoever, having devised or intending to devise *any scheme* or artifice to defraud, or *for obtaining* money or *property by means of false or fraudulent pretenses*, representations, or promises, transmits or causes to be transmitted by means of wire . . . any writings . . . for the purpose of executing such scheme or artifice, shall be fined . . . .

18 U.S.C. § 1343 (emphasis added). This crime contains two elements: 1) a scheme to defraud and

2) use of wires for the purpose of executing that scheme. *United States v. Alston*, 609 F.2d 531, 536 (D.C. Cir. 1979). However, the direct victim of the Complaint's allegations of fraudulent pretenses and a scheme to obtain and transmit property, *i.e.*, email communications, was CLEAN, not Greenpeace. Given Greenpeace's indirect relationship to the conduct at issue, any injuries suffered by Greenpeace because of Defendants' wire fraud are speculative at best.

    The *Anza* analysis illuminates the proximate cause issues in this matter. Like the State of New York, it was CLEAN that was defrauded and dealt with under false pretenses,[12] not Greenpeace. Greenpeace alleges that Mr. Rogers used wires to forward confidential e-mails and reports related to Greenpeace to BBI, *see* Compl. ¶ 172(b), but this confidential information belonged to CLEAN, not Greenpeace. As in *Anza*, the difficulties in quantifying damage stemming from actions remote to the plaintiff are present here. The damage suffered by Greenpeace from Mr. Rogers's alleged monitoring and forwarding confidential e-mails of another entity would be extremely difficult to ascertain and distinguish. The success or failure of Greenpeace's environmental campaigns could have been caused by any number of pressure points well beyond Mr. Rogers's email escapades. If a jury were to consider this claim, it would need to quantify the harm done to the Louisiana campaign against Sasol and then calculate whether any portion of that befell Greenpeace rather than CLEAN. The entire litigation would focus on speculative consequences of the alleged events. "The element of proximate causation recognized in *Holmes* is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." *Anza*, 547 U.S. at

---

[12] The Court notes the Supreme Court's holding in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008) that a RICO plaintiff, relying on mail fraud as the predicate criminal act for defendant's RICO violation, need not show that it relied on the defendant's alleged misrepresentations. *Id*. at 661. The Court does not find that Greenpeace's lack of reliance on Defendants' misrepresentations are fatal to its claim.

460.

The distance between the scheme perpetrated against CLEAN and the alleged harms that Greenpeace suffered is too great. This Court can find no direct link between the actions against CLEAN and Greenpeace's RICO claims. Accordingly, Greenpeace's civil RICO claims based upon Defendants acts of wire fraud will be dismissed.

### C. Counts Seven and Nine (Conspiracy)

Because Greenpeace fails to state a claim under § 1962(c), its conspiracy claims under 18 U.S.C. 1962(d) must likewise fail. Counts Seven and Nine of the Complaint state Defendants conspired to violate § 1962(c) in violation of § 1962(d), which renders it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of 18 U.S.C. 1962." 18 U.S.C. 1962(d). To establish a violation of § 1962(d), a conspirator must have intended "to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas v. United States*, 522 U.S. 52, 65 (1997) (using the criminal law of conspiracy to define a violation of § 1962(d)). In this instance, Greenpeace fails to state a claim under § 1962(c) because it can tie no injury directly to Defendants' alleged racketeering activity. Since a claim under § 1962(d) must also rest on allegations that Greenpeace was injured by a predicate criminal act or an act that is otherwise unlawful under RICO, the § 1962(d) counts fail. *Beck v. Prupis*, 529 U.S. 494, 507 (2000). Counts Seven and Nine will be dismissed.

### IV. Conclusion

For the reasons stated above, the RICO allegations in Counts Six through Nine of the Complaint will be dismissed because they fail to state a claim. The Court declines to extend supplemental jurisdiction over the state-law claims otherwise pled. *See* 28 U.S.C. § 1367(c)(3). As

a result, Counts One through Five of the Complaint will also be dismissed.

    A memorializing Order accompanies this Memorandum Opinion.


Date: September 9, 2011                             /s/
                                                 ROSEMARY M. COLLYER
                                                 United States District Judge